STATE OF NORTH CAROLINA v. FRANK W. PETERSILIE

No. 43PA92

(Filed 30 July 1993)

1. **Appeal and Error §§ 48, 362 (NCI4th); Criminal Law § 67 (NCI4th) — misdemeanors — original trial in superior court — failure of record to show jurisdiction — prosecutor's statement insufficient to show presentment — vacation of judgment**

The Court of Appeals did not err by vacating the superior court's judgment in a prosecution for publishing unsigned materials about a candidate for public office in violation of N.C.G.S. § 163-274(7) on the ground that the record on appeal showed that the superior court lacked subject matter jurisdiction where all the offenses charged were misdemeanors; the only charging documents in the record on appeal are grand jury indictments; and the superior court has no jurisdiction to try by indictment a defendant charged with a misdemeanor unless the charges which are the subject of an indictment are initiated by a presentment. A statement in the trial transcript by the district attorney informing the court that the misdemeanor charges originated by presentment was insufficient to comply with the requirement of Appellate Rule 9(a)(3)(e) that the record shall contain "copies of all warrants, informations, presentments, and indictments upon which the case has been tried in any court," since the rule contemplates that all charging documents must be copied and presented verbatim in the record on appeal, and mere references to such documents in the trial transcript cannot suffice for verbatim copies of the documents themselves or substitute for such copies when the copies are missing from the record.

**Am Jur 2d, Criminal Law § 352; Justices of the Peace § 108.**

2. **Appeal and Error §§ 48, 367 (NCI4th) — motion to amend record — addition of presentment — denial by Court of Appeals not error — election by Supreme Court to allow amendment**

The Court of Appeals did not err when it denied the State's motion to amend the record on appeal by adding copies of the presentment upon which misdemeanor charges were initiated against defendant to show that the superior court had jurisdiction over the case. However, the Supreme Court

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

elects to allow the amendment to reflect subject matter jurisdiction so that it may reach the substantive issues of the appeal.

**Am Jur 2d, Appeal and Error §§ 482, 484; Justices of the Peace § 108.**

**3. Elections § 13 (NCI4th) — unsigned publication of charge against election candidate — statute prohibiting — not unconstitutionally vague**

As used in the statute making it unlawful for anyone in the context of an election (1) to publish (2) any charge (3) derogatory to a candidate or calculated to affect the candidate's electoral chances (4) without signing the publication, N.C.G.S. § 163-274(7), the verb "to publish" is to be given its ordinary meaning, and the term "charge" is interpreted to mean an accusation of wrongdoing. When so interpreted, the statute defines the proscribed conduct with sufficient definiteness so that it is not unconstitutionally vague.

**Am Jur 2d, Elections §§ 379, 380.**

**4. Elections § 13 (NCI4th); Constitutional Law § 117 (NCI4th) — unsigned publication of charge against election candidate — statute prohibiting — no violation of free speech**

The statute making it unlawful for anyone to publish any charge derogatory to an election candidate or calculated to affect the candidate's electoral chances without signing the publication, N.C.G.S. § 163-274(7), is not constitutionally overbroad so as to violate free speech guarantees in the federal and state constitutions. The statute serves the compelling interest of the State of promoting fair and honest elections and is drawn no more broadly than is necessary to serve that interest. U.S. Const. amend. I; N.C. Const. art. I, § 14.

**Am Jur 2d, Constitutional Law §§ 496, 497; Elections §§ 379, 380.**

**5. Elections § 13 (NCI4th) — publishing unsigned materials about candidates — alternate theories — erroneous intent instruction on one theory — prejudice**

In a prosecution for publishing unsigned materials about two candidates for public office in violation of N.C.G.S. § 163-274(7), the trial court erred by instructing the jury that, in order to convict defendant, it must find that defendant

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

published "a charge *he intended* to be derogatory to a candidate for election to the Boone Town Council, or which he calculated would affect such candidate's chances of election," since the statute permits a conviction if the jury finds either (1) that the published material was a derogatory charge or (2) that the charge was "calculated" by defendant to affect a candidate's chances for nomination or election; the jury's determination of whether the material was a derogatory charge is not based on defendant's intention but on its objective interpretation of the publication; and the trial court's instruction permitted the jury to convict defendant upon a finding that defendant only intended the materials to be derogatory even if, objectively, the jury did not consider them to be so. Because the trial court incorrectly instructed the jury regarding one of two possible theories upon which defendant could be convicted and it is unclear upon which theory or theories the jury relied in arriving at its guilty verdict, it is assumed that the jury based its verdict on the theory for which it received an improper instruction.

**Am Jur 2d, Elections §§ 379, 380.**

6. **Evidence and Witnesses §§ 906, 2047 (NCI4th)— unsigned materials about candidates—opinions of others as to whether derogatory or hurtful—inadmissible hearsay**

In a prosecution for publishing unsigned materials about two candidates for public office, testimony by the candidates as to the actual opinions expressed by certain local residents out of court concerning whether the materials were derogatory or hurtful to the candidates' chances of being elected was admitted for the truth of what was said and was inadmissible hearsay. The statements were not admissible as lay witness opinion testimony under N.C.G.S. § 8C-1, Rule 701 because neither witness was testifying as to his or her own opinion.

**Am Jur 2d, Evidence § 497; Expert and Opinion Evidence §§ 26, 53, 54.**

Justice MITCHELL dissenting.

Justice PARKER did not participate in the consideration or decision of this case.

**STATE v. PETERSILIE**

[334 N.C. 169 (1993)]

On discretionary review pursuant to N.C.G.S. § 7A-31 of the decision of the Court of Appeals, 105 N.C. App. 233, 414 S.E.2d 41 (1992), vacating a judgment entered by Lamm, J., at the 19 October 1990 Criminal Session of Superior Court, Watauga County. Heard in the Supreme Court 11 September 1992.

*Lacy H. Thornburg, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, for the State.*

*Chester E. Whittle, Jr., for defendant-appellee.*

EXUM, Chief Justice.

The substantive issue before us is whether N.C.G.S. § 163-274(7), prohibiting anonymous, derogatory charges against candidates for primary or general elections, violates the free speech guarantees of the First Amendment of the United States Constitution or Article I, § 14 of the North Carolina Constitution, or both. Before reaching this constitutional issue, however, we must first dispose of a procedural question: whether the Court of Appeals erred by vacating the judgment of the trial court on the ground of lack of subject matter jurisdiction. We conclude the Court of Appeals did not err on the record before it when it vacated the judgment of the trial court; but, for reasons of judicial economy and to reach the important constitutional question raised, we elect to allow the State's motion to amend the record on appeal, which amendment demonstrates that the trial court had jurisdiction over the case. As for the constitutional issue, we conclude the statute does not violate defendant's free speech rights under either the federal or state constitution. We do find, however, that the trial court committed reversible error by incorrectly stating the law in its jury instructions; and defendant therefore is entitled to a new trial. We also conclude that the trial court erred in admitting certain out-of-court opinion evidence.

I.

Defendant was convicted of eleven counts of publishing unsigned materials about a candidate for public office — all misdemeanors in violation of N.C.G.S. § 163-274(7). Judgment was entered imposing a sentence of two years' imprisonment which was suspended for three years upon the condition defendant serve six weekends in the county jail. The only charging documents contained in the record on appeal are grand jury indictments. The Court of Appeals

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

vacated the trial court judgment for lack of subject matter jurisdiction in the superior court. We allowed the State's petition for further review.

Evidence at defendant's trial tended to show as follows: Defendant owned a land development company, Property Services and Investments (PSI), in Boone, North Carolina, which was primarily engaged in the management of rental properties. Defendant was also among ten candidates running for three seats on the Boone Town Council in the 10 October 1989 election. Only one candidate, Ben Suttle, received a clear majority. A run-off election was required, but defendant did not receive enough votes to qualify for the run-off. Four other candidates did qualify for the run-off election, two of whom were Saul Chase and Louise Miller.

On 1 or 2 November 1989, defendant obtained a copy of a letter addressed to his mother with which was enclosed a copy of a Washington Post article written by Nan Chase, candidate Chase's wife. The article expressed Mrs. Chase's opinion about prayer in school. The accompanying letter stated:

Chase wants to take away aggressive Christian influence from public buildings and gathering places, such as our schools.

In an article published in the Washington Post, Mrs. Saul Chase ridiculed the people of Boone for their support of Christianity stating that here "Christianity is . . . intimidating and self-perpetuating."

Calling herself an "unbeliever (in Christianity) in the midst of the pious", Mrs. Saul Chase states that she is unable to openly criticize "religious paraphernalia displayed in public offices and on state owned vehicles" and she also says that if (anyone) speak(s) out forcefully against what may be an unconstitutional mixing of church and state, they will be unable to enter the political mainstream that has the power to separate the two spheres".— This thought has not been spoken to the people of Boone by Mrs. Chase, only to the Washington Post. Why keep it from us? Because her husband is on our Town Council, and was just put in the run off for re-election. If he wins, he will have the power to take away any Christian influence from the town employees, buildings, etc. It can be assumed that Chase allegedly has a goal to wipe out Christian influence from our town, take it away form the very God-fearing

Christian people who helped put him in office. Candidates should be open about all of their feelings of all issues and it appears that Saul Chase has been deceptive to us by not supporting the good, wholesome beliefs of our people. A deception that is allegedly a deliberate attempt to gain power to take our Christian atmosphere from us. We, the town, should stop him, keep him out of our town government and hold fast to our Christian freedoms. Vote against Saul Chase!

With the help of various members of his staff at PSI, defendant reproduced and mailed approximately thirty to seventy copies of the letter to persons who voted in the 10 October 1989 election. Defendant personally addressed several of the envelopes. He did not sign his name to the mailing or otherwise indicate that the mailing came from him.

On 3 or 4 November 1989 defendant received a copy of a flyer concerning candidates Miller and Chase. The flyer stated:

**VOTE LIQUOR BY THE DRINK FOR BOONE.**

FOUR YEARS AGO, WITH THE HELP OF SAUL CHASE, THE A.S.U. STUDENTS BROUGHT BEER TO BOONE. NOW IS THE TIME TO COMPLETE THE PARTY!

SUTTLE, DUGGER & MARSH REFUSE TO ENDORSE THIS ISSUE AND WOULD WORK TO DEFEAT THE REFERENDUM.

**VOTE SAUL CHASE AND LOUISE MILLER
NOV. 7TH
THE "PRO-LIQUOR" CANDIDATES**

Defendant copied and mailed out twenty to twenty-five unsigned copies of the flyer. Again, defendant did not sign his name to the mailing or otherwise identify himself as the person who sent it.

On 15 November 1989 Special Agent Steve Wilson of the North Carolina State Bureau of Investigation began investigating the mailings. Wilson spoke with defendant on 27 November 1989 at defendant's PSI office. When Wilson informed defendant that he had compared the handwriting on defendant's notice of candidacy to handwriting appearing on the flyers and anonymously mailed envelopes, defendant admitted addressing some of the anonymous letters. He said he was unaware that sending the anonymous material was a criminal violation.

The opinion of the Court of Appeals was filed 21 January 1992. Concluding that the record on appeal demonstrated a lack of jurisdiction in the superior court, the Court of Appeals vacated the superior court's judgment. On 22 January 1992 the State moved in the Court of Appeals to amend the record on appeal by adding certified copies of the presentment upon which charges were initiated against defendant. The Court of Appeals denied this motion on 23 January 1992.

## II.

[1] The State contends the Court of Appeals erred by vacating the superior court proceedings for lack of jurisdiction. We conclude the Court of Appeals acted properly on the record before it.

Like the majority of states, North Carolina requires the State to prove jurisdiction beyond a reasonable doubt in a criminal case. *State v. Batdorf*, 293 N.C. 486, 493, 238 S.E.2d 497, 502 (1977). Exclusive, original jurisdiction of all misdemeanors lies in the District Court Division of the General Court of Justice. N.C.G.S. § 7A-272 (1989). The superior court has jurisdiction to try a misdemeanor charge:

(1) Which is a lesser included offense of a felony on which an indictment has been returned, or a felony information as to which an indictment has been properly waived; or

(2) When the charge is initiated by presentment; or

(3) Which may be properly consolidated for trial with a felony under G.S. 15A-926;

(4) To which a plea of guilty or nolo contendere is tendered in lieu of a felony charge; or

(5) When a misdemeanor conviction is appealed to the superior court for trial de novo, to accept a guilty plea to a lesser included or related charge.

N.C.G.S. § 7A-271(a) (1989).

"When the record shows a lack of jurisdiction in the lower court, the appropriate action on the part of the appellate court is to arrest judgment or vacate any order entered without authority." *State v. Felmet*, 302 N.C. 173, 176, 273 S.E.2d 708, 711 (1981). *See also State v. Hardy*, 298 N.C. 191, 257 S.E.2d 426 (1979) (Record on appeal shows lack of jurisdiction when a defendant is convicted

in superior court of committing a crime for which he is not charged; judgment arrested.); *State v. Guffey*, 283 N.C. 94, 194 S.E.2d 827 (1973) (Record on appeal shows lack of jurisdiction when the superior court convicts a defendant of a misdemeanor for which there is no conviction in district court; judgment arrested.); *State v. Evans*, 262 N.C. 492, 137 S.E.2d 811 (1964) (Record on appeal shows lack of jurisdiction when a defendant who is never tried in district court is tried in superior court upon a warrant; judgment arrested and vacated.).

Contrarily, "when the record is silent and the appellate court is unable to determine whether the court below had jurisdiction, the appeal should be dismissed." *Felmet*, 302 N.C. at 176, 273 S.E.2d at 711. *See also State v. Hunter*, 245 N.C. 607, 96 S.E.2d 840 (1957) (No copy of the bill of indictment contained in the record on appeal; appeal dismissed.); *State v. Banks*, 241 N.C. 572, 86 S.E.2d 76 (1955) (Where Record failed to disclose jurisdiction in the court below; appeal dismissed.). In *Felmet*, we concluded the record was silent as to jurisdiction when the defendant was tried in superior court upon a warrant charging misdemeanor trespass because the record did not indicate whether the defendant had been tried in district court. We, therefore, held the Court of Appeals properly dismissed the appeal.

As did the Court of Appeals, we conclude this is a case in which the record affirmatively shows a lack of jurisdiction. According to the record, the only charging documents are indictments. All the offenses charged are misdemeanors. Under N.C.G.S. § 7A-271, the superior court has no jurisdiction to try by indictment a defendant charged with a misdemeanor unless the charges which are the subject of the indictment were initiated by a presentment.

The State contends the trial transcript shows that the charges against defendant were initiated by a presentment pursuant to N.C.G.S. § 7A-271(a)(2). The transcript does include a statement by the district attorney informing the court that the misdemeanor charges originated by presentment. Rule 9(a)(3)(e) of the North Carolina Rules of Appellate Procedure requires the record on appeal in criminal actions to include:

> so much of the evidence, set out in the form provided in Rule 9(c)(1), as is necessary for an understanding of the errors assigned, or a statement that the entire verbatim transcript of the proceedings is being filed with the record pursuant

to Rule 9(c)(2), or designating portions of the transcript to be so filed . . . .

N.C. R. App. P. 9(a)(3)(e). Relying on this requirement, the State asserts that reference to the presentment contained in the trial transcript is a part of the record and, as such, is sufficient to confer jurisdiction.

We are not persuaded by this argument. Appellate Rule 9(a)(3) sets forth the requisite contents of the record on appeal in criminal actions. Subsection (e), relied on by the State, is directed only to the presentation of the evidence. Subsection (c) governs how charging documents must be presented, and it provides that the record shall contain "*copies* of all warrants, informations, present-ments, and indictments upon which the case has been tried in any court." N.C. R. App. P. 9(a)(3) (emphasis added). It is clear that this rule contemplates that all charging documents must be copied and presented verbatim in the record on appeal. Mere references to such documents in the trial transcript cannot suffice for verbatim copies of the documents themselves, nor may such references substitute for such copies when the copies are missing from the record.

## III.

[2] Having concluded that the Court of Appeals acted properly on the record before it in vacating the judgment in the trial court, we also conclude the Court of Appeals did not err when it denied the State's motion to amend the record.

In *Felmet*, the defendant moved for leave to amend the record to include "the judgment of the district court which reflected de-fendant's appeal therefrom to the superior court" to show how the superior court obtained subject matter jurisdiction over his case. *Felmet*, 302 N.C. at 174, 273 S.E.2d at 710. The Court of Appeals denied the motion. *Id*. We concluded that the denial was a decision within the discretion of the Court of Appeals and that we could find no abuse of that discretion. *Id*. at 176, 273 S.E.2d at 711. Nevertheless, we held the record should be amended to reflect subject matter jurisdiction so that we could reach the substan-tive issue of the appeal. In so holding, we stated, "[this] is the better reasoned approach and avoids undue emphasis on procedural niceties." *Id*.

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

While we find no abuse of discretion on the part of the Court of Appeals in denying the State's motion to amend, we elect as we did in *Felmet* to allow the State leave to amend.

When the record is amended to add the presentment, it is clear the superior court had jurisdiction over these misdemeanors under N.C.G.S. § 7A-272(2). Section 15A-641(c) of the North Carolina General Statutes provides:

> A presentment is a written accusation by a grand jury, made on its own motion and filed with a superior court, charging a person, or two or more persons jointly, with the commission of one or more criminal offenses. A presentment does not institute criminal proceedings against any person, but the district attorney is obligated to investigate the factual background of every presentment returned in his district and to submit bills of indictment to the grand jury dealing with the subject matter of any presentments when it is appropriate to do so.

N.C.G.S. § 15A-641(c) (1988). Section 15A-628(a)(4) of the North Carolina General Statutes states that a grand jury

> may investigate any offense as to which no bill of indictment has been submitted to it by the prosecutor and issue a presentment accusing a named person or named persons with one or more criminal offenses if it has found probable cause for the charges made. *An investigation may be initiated upon the concurrence of 12 members of the grand jury itself or upon the request of the presiding or convening judge or the prosecutor.*

N.C.G.S. § 15A-628(a)(4) (1988) (emphasis added).

The amendment to the record shows that on 2 January 1990, the district attorney asked the Watauga County Grand Jury, pursuant to N.C.G.S. § 15A-628(a)(4), to investigate the charges against defendant. The grand jury did so and, pursuant to § 15A-641(c), filed with the superior court on 2 January 1992 a presentment against defendant charging him with violating N.C.G.S. § 163-274(7). Thereafter, the district attorney, pursuant to § 15A-641(c), submitted two bills of indictment to the grand jury dealing with the subject matter of the presentment; and the grand jury returned true bills of indictment on 19 February 1990 upon which defendant was tried and convicted.

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

The judgment of the superior court should not, on the record as amended, be vacated for lack of subject matter jurisdiction.

## IV.

We now address the important constitutional questions raised in this case. Defendant raised the constitutional issues by moving before trial to dismiss the indictments on the ground of the unconstitutionality of the statute on which the indictments were based. He renewed the motion at the close of the State's evidence and at the close of all the evidence. All motions to dismiss were denied by the trial court, and defendant has assigned these denials as error.

[3] Defendant contends that N.C.G.S. § 163-274(7) is unconstitutionally vague and overbroad so as to violate the free speech guarantees in both the federal and state constitutions. We conclude that N.C.G.S. § 163-274(7), properly interpreted, is not unconstitutionally vague; and we think the statute serves a legitimate compelling interest of the State and is drawn no more broadly than is necessary for that purpose.

The statute at issue provides as follows:

### § 163-274. Certain Acts declared misdemeanors.

Any person who shall, in connection with any primary or election in this State, do any of the acts and things declared in this section to be unlawful, shall be guilty of a misdemeanor. It shall be unlawful:

. . . .

(7) For any person to publish in a newspaper or pamphlet or otherwise, any charge derogatory to any candidate or calculated to affect the candidate's chances of nomination or election, unless such publication be signed by the party giving publicity to and being responsible for such charge.

N.C.G.S. § 163-274(7) (1991).

This statute is part of Subchapter VIII, titled "Regulation of Election Campaigns," and of Article 22, titled "Corrupt Practices and Other Offenses against the Elective Franchise," of our General Statutes. First enacted in 1931 (see Chapter 348, section 9(10) of the 1931 Session Laws), it is in the general category of election reform statutes, which take many forms and which are designed

to prohibit various kinds of practices thought to be inimical to fair elections. *Developments in the Law—Elections*, 88 Harv. L. Rev. 1111, 1286-87 (1975); *see also Burson v. Freeman*, 504 U.S. ---, 119 L. Ed. 2d 5 (1992) for the Court's historical account of these reforms. Forty-three states have enacted legislation similar to N.C.G.S. § 163-274(7) with the clear intent of "promot[ing] honesty and fairness in the conduct of an election campaign." *Tennessee v. Acey*, 633 S.W.2d 306, 307 (Tenn. 1982). Additionally, the United States Congress has enacted a statute making it a criminal offense to make an expenditure to publish and distribute statements expressly advocating the election or defeat of a clearly identified candidate without stating the name of the person or persons responsible for its publication and distribution. 2 U.S.C. § 441d (1988); *United States v. Scott*, 195 F. Supp. 440 (D. N.D. 1961).

A.

Defendant first contends that certain terms in the statute are so vague that it fails to provide persons clear notice of the prohibited conduct.

The test for determining whether a statute is unconstitutionally vague has been stated as follows:

A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.

*Connally v. General Construction Co.*, 269 U.S. 385, 391, 70 L. Ed. 322, 328 (1926); *accord Coates v. Cincinnati*, 402 U.S. 611, 29 L. Ed. 2d 214 (1971); *In re Burrus*, 275 N.C. 517, 531, 169 S.E.2d 879, 888 (1969). While vagueness and uncertainty may invalidate a statute, *In re Burrus*, 275 N.C. at 531, 169 S.E.2d at 888, the Court will strive to interpret a statute to avoid serious doubts about its constitutionality. *Delconte v. State*, 313 N.C. 384, 402, 329 S.E.2d 636, 647 (1985). Thus if two reasonable constructions of the statute are possible, this Court will adopt the construction which renders the statute constitutional. *In re Banks*, 295 N.C. 236, 239, 244 S.E.2d 386, 388 (1978); *Hobbs v. Moore County*, 267 N.C. 665, 149 S.E.2d 1 (1966).

The statute, properly interpreted, is not unconstitutionally vague. It prohibits anyone in the context of an election from (1) publishing (2) any charge (3) derogatory to a candidate or calculated

to affect the candidate's electoral chances (4) without signing the publication. Contrary to defendant's position, we see nothing vague about the statute's use of the verb, "to publish." To publish means simply "1 a. to declare publicly: make generally known: DISCLOSE, CIRCULATE . . . b. to proclaim officially . . . c. to make public announcement of . . . d. PUBLICIZE . . . to give publication to . . . ." *Webster's Third New International Dictionary* 1837 (1976). Clearly defendant's mailing the materials in question constituted their publication under the ordinary meaning of the term.

We find "charge" to be the only term in the statute whose meaning may not be commonly understood and which requires judicial interpretation. *See State v. Crawford*, 329 N.C. 466, 485, 406 S.E.2d 579, 590 (1991). We find the following definitions to be instructive: *The American Heritage Dictionary* 260 (2d college ed. 1985) ("6. An accusation or indictment: *a charge of conspiracy to defraud");* *Webster's Ninth New Collegiate Dictionary* 227 (1988) ("6 . . . **b** : a statement of complaint or hostile criticism <denied the *[charge]s* of nepotism that were leveled against him>"); *Webster's Third New International Dictionary* 377 (1966) ("**6 a** : an accusation of a wrong or offense : ALLEGATION, INDICTMENT <arrested on the *[charge]* of bribery> **b** : a statement of complaint or hostile criticism <the *[charge]* that earned incomes are based upon no principle of equity>"); *see also Black's Law Dictionary* 233 (6th ed. 1990) ("an accusation"); *Legal Thesaurus* 71 (1980) ("*Accusation* . . . allegation, arraignment, attack, blame, castigation, censure, citation, complaint, condemnation, count, countercharge"). The common thread in these definitions is that "charge" means an "accusation." An "accusation" is defined as "a charge of wrongdoing; imputation of guilt or blame." *Random House Webster's College Dictionary* 10.

A Kentucky statute provided: "Any person [could] prefer *charges* against a member of the police or fire department by filing them with the city manager" for purposes of having the accused "reprimanded, dismissed or demoted." *Mason v. Seaton*, 303 Ky. 528, 529, 198 S.W.2d 205, 206 (1946) (emphasis added). The Court of Appeals of Kentucky held that " 'charges' signify an accusation . . . of illegal conduct, either of omission or commission, by the person charged." *Id.* at 531, 198 S.W.2d at 207. In *Rosales v. City of Elroy*, 122 Ariz. 134, 593 P.2d 688 (1979), a former police officer who had been discharged for misconduct sued the city and the police chief, alleging libel and slander because the mayor and police chief had informed a newspaper that "charges" had been placed

against him. Both defendants contended that the officer could not prevail against them because no formal criminal charges had been filed against the officer. The Arizona court interpreted the word "charges" as follows: "The basic premise of appellees' argument is that the word 'charges' means 'the filing of criminal charges' . . . . We do not agree with this premise. The word 'charges' also denotes 'accusations' or 'allegations' and does not necessarily mean the filing of criminal charges." *Id.* at 136, 593 P.2d at 690.

Using the above definitions and analyses, we conclude the legislature intended the word "charge" to mean an accusation of wrongdoing.

As interpreted, the statute defines the proscribed conduct with sufficient definiteness so as to avoid arbitrary and discriminatory enforcement. *See Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 71 L. Ed. 2d 362 (1982). We therefore conclude the statute is not unconstitutionally vague.

## B.

[4] Defendant next argues that the statute is not drawn narrowly enough and is constitutionally overbroad. Defendant agrees that the statute's goal of prohibiting anonymous pejorative campaign material is legitimate and concedes that "with more specificity in legislative drafting, that aim may be constitutionally sustainable." Defendant-Appellee's New Brief, p. 22. He contends that, as drawn, the statute "embraces protected speech which the government may not restrict." *Id.* at 21. The State contends to the contrary, arguing the statute is narrowly drawn so as to encompass only "anonymous, derogatory material that is directed toward specific candidates." Brief for the State, p. 31. The State's position is that the statute could not be drawn more narrowly and still serve the State's compelling interest in insuring as far as possible fair elections. For the reasons which follow we find ourselves in agreement with the State.

The parties agree the State's interest in promoting fair and honest elections is legitimate and compelling.[1] They disagree on whether the statute, as drafted, is necessary to serve that interest.

---

1. Defendant states in his brief at p. 30: "The Defendant agrees with the State that '[i]t is well settled that a state has a compelling interest in preserving the integrity and orderliness of the election process.'"

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

This is the ultimate question for decision under the doctrines developed by the United States Supreme Court in interpreting the Free Speech Clause of the United States Constitution and which we adopt here for purposes of applying the Free Speech Clause of the North Carolina Constitution.

The First Amendment to the Federal Constitution provides:

Congress shall make no law . . . abridging the freedom of speech, or of the press[.]

*U.S. Const.* amend. I. Similarly, Article I, § 14 of the North Carolina Constitution states:

Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse.

*N.C. Const.* art. I, § 14.

Under the Federal Constitution, "freedom of speech . . . which [is] secured by the First Amendment against abridgement by the United States, [is] among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgement by a state." *Thornhill v. Alabama*, 310 U.S. 88, 95, 84 L. Ed. 1093, 1098 (1940). Where a statute regulating the time, place and manner of expressive activity is content-neutral in that it does not forbid communication of a specific idea, it will be upheld if the restriction is "narrowly tailored to serve a significant governmental interest," and it "leaves open ample alternatives for communication." *Burson v. Freeman*, 504 U.S. ---, ---, 119 L. Ed. 2d 5, 13 (1992); *United States v. Grace*, 461 U.S. 171, 177, 75 L. Ed. 2d 736, 743-44 (1983). A statute, however, which on its face regulates the content of protected speech in that it restricts communication of a specific idea "must be subjected to exacting scrutiny: the State must show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Burson*, 504 U.S. at ---, 119 L. Ed. 2d at 13-14, *quoting Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45, 74 L. Ed. 2d 794, 804 (1983). A content-based regulation of speech occurs where restrictions are placed on the espousal of a particular viewpoint, or when there is a prohibition of public discussion on an entire topic. *Burson*, 504 U.S. at ---, 119 L. Ed. 2d at 13. In such a case, "a state must do more than assert a compelling state interest—it must demonstrate that its

law is necessary to serve the asserted interest." *Id.* at ---, 119 L. Ed. 2d at 15.

Because the statute expressly regulates political speech, it is content-based. *E.g., id.* at ---, 119 L. Ed. 2d at 13. We must give it exacting scrutiny; and we must be satisfied that it is necessary to serve the State's compelling interest in having fair, honest elections.

Our State Constitution offers similar free speech protection in Article I, Section 14. This provision is self-executing, and we have recognized a cause of action against state officials for its violation. *Corum v. University of North Carolina*, 330 N.C. 761, 782, 413 S.E.2d 276, 289, *cert. denied, Durham v. Corum*, --- U.S. ---, 121 L. Ed. 2d 431 (1992). In some of our cases, the Court has found the guarantees in the state and federal constitutions to be parallel and has addressed them as if their protections were equivalent. *Felmet*, 302 N.C. 173, 273 S.E.2d 708; *Andrews v. Chateau X*, 296 N.C. 251, 250 S.E.2d 603 (1979), *vacated on other grounds*, 445 U.S. 947, 63 L. Ed. 2d 782 (1980). We have also recognized that "in construing provisions of the Constitution of North Carolina, this Court is not bound by opinions of the Supreme Court of the United States construing even identical provisions in the Constitution of the United States." *State v. Hicks*, 333 N.C. 467, 483, 428 S.E.2d 167, 176 (1993); *State v. Arrington*, 311 N.C. 633, 642, 319 S.E.2d 254, 260 (1984). "We do, however, give great weight to decisions of the Supreme Court of the United States interpreting provisions of the Constitution of the United States which are parallel to provisions of the State Constitution to be construed." *Id.* at 484, 428 S.E.2d at 176. In this case, for the purpose of applying our State Constitution's Free Speech Clause we adopt the United State's Supreme Court's First Amendment jurisprudence.

The United States Supreme Court has long permitted certain regulations of protected speech for appropriate reasons. *Elrod v. Burns*, 427 U.S. 347, 49 L. Ed. 2d 547 (1976). Thus, a paid lobbyist, a member of a specialized occupation, can be required to register and disclose his or her contributors. *United States v. Harriss*, 347 U.S. 612, 98 L. Ed. 989 (1954). A candidate for election can be required to disclose the sources of contributions so as to prevent corruption. *Buckley v. Valeo*, 424 U.S. 1, 46 L. Ed. 2d 659 (1976). A publisher of a newspaper can be required to make disclosures to obtain second-class mailing privileges. *Lewis Publishing Co. v.*

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

*Morgan,* 229 U.S. 288, 57 L. Ed. 1190 (1913). A grand jury can require disclosure of newspaper sources to aid in the prosecution of criminal activity. *Branzburg v. Hayes,* 408 U.S. 665, 33 L. Ed. 2d 626 (1972).

Even in the area of political speech, the United States Supreme Court has recognized that a state "indisputably has a compelling state interest in preserving the integrity and reliability of its election process." *Eu v. San Francisco County Democratic Comm.,* 489 U.S. 214, 231, 103 L. Ed. 2d 271, 287 (1989); *e.g., Schuster v. Imperial County Airport,* 109 Cal. App. 3d 887, 896, 167 Cal. Rptr. 447, 451 (1980), *cert. denied,* 450 U.S. 1042, 68 L. Ed. 2d 239 (1981). While "there is practically universal agreement that a major purpose of the [First] Amendment [is] to protect the free discussion of governmental affairs . . . includ[ing] discussion of candidates," *Buckley v. Valeo,* 424 U.S. at 14, 46 L. Ed. 2d at 685, there is also agreement as to the compelling government interest in ensuring honest and fair elections. *Burson,* 504 U.S. at ---, 119 L. Ed. 2d at 14-15. Therefore, the Supreme Court has "upheld generally-applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Anderson v. Celebrezze,* 460 U.S. 780, 788 n.9, 75 L. Ed. 2d 547, 557 n.9 (1983); *Burson,* 504 U.S. at ---, 119 L. Ed. 2d at 15.

We believe the statute before us is an example of such a evenhanded restriction. In arriving at this decision two cases decided by the United States Supreme Court have been our polar stars: *Burson,* 504 U.S. ---, 119 L. Ed. 2d 5, and *Talley v. California,* 362 U.S. 60, 4 L. Ed. 2d 559 (1960). *Burson* is the latest of several decisions of the Court sustaining the constitutionality of various election law reform statutes against free speech challenges. *Burson* holds that a state statute prohibiting the display and distribution of campaign materials and the solicitation of votes for or against a candidate or party within 100 feet from the entrance of the polling place did not violate the Free Speech Clause. A plurality of justices concluded the statute survived strict scrutiny and was necessary to serve the state's compelling interest in preventing voter intimidation and fraud and "in protecting the right to vote." *Burson,* 504 U.S. at ---, 119 L. Ed. 2d at 20. *Burson* relied heavily on the history of campaign abuses which election reform statutes like the one before it were designed to curb in concluding the statute was a necessary infringement on free speech.

*Talley* holds that a municipal ordinance banning the distribution of anonymous "handbill[s] in any place under any circumstances" violates the Free Speech Clause. 362 U.S. at 61, 65, 4 L. Ed. 2d at 561, 563. Relying on history demonstrating the need for certain persecuted groups at certain times "to criticize oppressive practices and laws either anonymously or not at all," *id.* at 64, 4 L. Ed. 2d at 563, the Court concluded the statute must fail because it prohibited too much. The municipality had argued that the ordinance was necessary to "identify those responsible for fraud, false advertising and libel." 362 U.S. at 64, 4 L. Ed. 2d at 562. The Supreme Court concluded there was no such necessity, saying:

> Yet the ordinance is in no manner so limited, nor have we been referred to any legislative history indicating such a purpose. Therefore we do not pass upon the validity of an ordinance limited to prevent these or any other supposed evils. This ordinance simply bars all handbills under all circumstances anywhere that do not have the names and addresses printed on them in the place the ordinance requires.

364 U.S. at 64, 4 L. Ed. 2d at 562. *Talley* thus expressly left open the question whether a more narrowly drawn ordinance would be upheld. *Tennessee v. Acey*, 633 S.W.2d 306. Interestingly, the dissenters in *Talley* (Associate Justices Clark, Frankfurter and Whittaker) cited electoral reform statutes prohibiting the distribution of anonymous campaign material directed toward political candidates as an example of valid restrictions on speech, saying

> the several States have corrupt practices acts outlawing, inter alia, the distribution of anonymous publications with reference to political candidates. While these statutes are leveled at political campaign and election practices, the underlying ground sustaining their validity applies with equal force here.

362 U.S. at 70, 4 L. Ed. 2d at 566 (Clark, Frankfurter, Whittaker, JJ., dissenting).

The statute before us falls in between the ones considered, respectively, by *Burson* and *Talley*. Like the statute in *Burson* it is directed at serving the state's compelling interest in protecting the integrity of the electoral process. Like the statute in *Talley* it proscribes anonymity. *Burson*, however, involved a prohibition on *all* speech within certain geographic boundaries. *Talley* involved

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

a prohibition of *all* anonymous handbills. Our statute, on the other hand, proscribes only anonymous speech only if that speech involves an accusation of wrongdoing against an electoral candidate which is derogatory or which is calculated to affect the candidate's chances for election. We conclude our statute, being more akin to the statute in *Burson*, survives strict scrutiny in that it is a necessary enactment which could not be drawn more narrowly in order to serve the state's compelling interest in protecting electoral integrity.

Defendant and the dissenters complain that the statute covers even truthful statements, and it clearly does. *Burson* teaches that this alone is no ground for striking the statute, for the restrictions on speech upheld in *Burson* also applied to truthful campaign materials. In the context of a campaign it is necessary for accusers of candidates to identify themselves, even if they speak the truth, in order for the electorate to be able to assess the accusers' bias and interest. Why is it that the accuser comes forward with the accusation, even if it is true? What motivates the accuser? This kind of information is required in order for the electorate to determine what weight, if any, should be given the accusation, even if it is true. The source of the charge is as much at issue as the charge itself. Our statute, then, serves the compelling state interest of "providing voters with information to aid them in assessing the weight to be given a particular statement. *There does not appear to be a less restrictive means of furthering this interest, and therefore, unlike the ordinance in Talley, campaign disclosure laws cannot be said to be overly broad.*" Developments—Election Law, 88 Harv. L. Rev. 1111, 1290 (1975) (emphasis supplied).

The statute, consequently, is necessary to serve a compelling state interest. Albeit a restraint on speech, it comports with the free speech guaranties in both the United States Constitution and the Constitution of North Carolina.

We are bolstered in our conclusion by decisions from other jurisdictions sustaining similar statutes against the contention that they violate free speech guaranties; the courts conclude the statutes are necessary to serve a state's compelling interest in protecting the integrity of the electoral process. *See, e.g., Tennessee v. Acey*, 633 S.W.2d at 307; *United States v. Scott*, 195 F. Supp. at 443; *Canon v. Justice Ct.*, 61 Cal. 2d 446, 452, 458-59, 393 P.2d 428, 431, 416, 39 Cal. Rptr. 228, 231, 235 (1964).

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

In *Canon v. Justice Court*, the Supreme Court of California held that a statute which, like our own, prohibited publication of anonymous literature designed to injure or defeat any candidate for public office by reflecting on his personal character or political action, was a constitutional restraint on free speech. 61 Cal. 2d at 451, 393 P.2d at 430, 39 Cal. Rptr. at 229. Although the *Canon* Court did find the statute unconstitutionally discriminatory against all individuals other than California voters, the court held that the statute in no way was flawed by overbreadth. In so holding, the *Canon* Court stated:

> [The statute] requires identification so that (1) the electorate may be better able to evaluate campaign material by examination of the competence and credibility of its source, (2) irresponsible attacks will be deterred, (3) candidates may be better able to refute or rebut charges — so that elections will be the expression of the will of an undeceived, well-informed public. It is clear that the integrity of elections, essential to the very preservation of a free society, is a matter 'in which the State may have a compelling regulatory concern.' . . . [The statute] was intended to deter the scurrilous hit and run smear attacks which are all too common in the course of political campaigns. The primary concern is not for the candidate, however, although it is clearly in the public interest to create conditions conducive to the encouragement of good citizens to seek public office. The chief harm is that suffered by all people when, as a result of the public having been misinformed and misled, the election is not the expression of the true public will.
>
> . . . .
>
> "[A]nonymity all too often lends itself, in the context of attacks upon candidates in the preelection period, to smears, as a result of which the electorate is deceived. Identification permits confrontation and often makes refutation easier and more effective. It tends to reduce irresponsibility. It enables the public to appraise the source."

*Id.* at 452-53, 459, 393 P.2d at 431-32, 435, 39 Cal. Rptr. at 231-32, 235.

In *United States v. Scott*, the United States District Court upheld Section 612 of Title 18 of the United States Code which reads:

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

Whoever willfully publishes or distributes . . . any card, pamphlet, circular, poster, dodger, advertisement, writing, or other statement relating to or concerning a person who has publicly declared his intention to do so to be publicly declared, which does not contain the names of the persons, associations, committees, and corporations responsible for the publication or distribution of the same, and the names of the officers of each such association, committee, or corporation, shall be fined not more than $1,000 or imprisoned not more than one year or both.

195 F. Supp. at 441. While 18 U.S.C.A. 612 considered by *Scott* was repealed in 1976, it has been replaced by a substantially similar statute. *See* 2 U.S.C.A. § 441d. The *Scott* Court held the statute was a constitutional enactment by the United States Congress that ensured "the electorate would be informed and [would] make its own appraisal of the reason or reasons why a particular candidate was being supported or opposed by an individual or group." *Id.* at 443. Although the statute in *Scott* was limited to candidates for the Executive Branch of the federal government and to candidates for United States Congress, the scope of its prohibition was not as narrow as section 163-274(7) in that it was not limited to "charges" against candidates.

In *Tennessee v. Acey*, the Supreme Court of Tennessee upheld a statute imposing criminal sanctions upon persons anonymously disseminating written statements about candidates for public office. 633 S.W.2d at 306. Recognizing the state's compelling interest in preserving the integrity of the electoral process and ensuring the existence of an informed electorate, the *Acey* Court concluded that the campaign literature disclosure law was the least restrictive means of furthering these interests. *Id.* at 307.

Defendant relies on *Talley v. California*, 362 U.S. 60, 4 L. Ed. 2d 559 (1960), and *Schuster v. Imperial County Municipal Court*, 109 Cal. App. 3d 887, 167 Cal. Rptr. 447 (1980), both of which we find distinguishable. We have already considered *Talley* and elaborated our reasons for believing that it does not control. *Schuster*, a California Court of Appeals case, dealt with a statute that prohibited "all anonymous political campaign literature" by all persons. 109 Cal. App. 3d at 890-91, 167 Cal. Rptr. at 448. Neither the *Talley* ordinance nor the *Schuster* statute was limited, as is our statute, to a far narrower spectrum of prohibited activity.

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

We recognize that other jurisdictions have found statutes proscribing anonymous publications to be unconstitutionally overbroad. We find these cases unpersuasive because, unlike our own, the statutes in question are considerably broader than ours. *Zwickler v. Koota*, 290 F. Supp. 244 (E.D. N.Y. 1968) (statute makes it a crime to distribute *any* handbill containing *any* statement concerning any candidate in connection with any election of public officers unless signed — not limited to charges), *rev'd on other grounds*, 394 U.S. 103, 22 L. Ed. 2d 113 (1969); *California v. Bongiorni*, 205 Cal. App. 2d Supp. 856, 23 Cal. Rptr. 565 (1962) (statute requires signature of person responsible on circulars or handbills that *seek to influence the result of elections* — not limited to a particular candidate); *Illinois v. White*, 116 Ill. 2d 171, 506 N.E.2d 1284 (1987) (statute requires signature of any person who publishes or distributes *any* political literature *soliciting votes for or against any candidate or for or against any public questions to be submitted for the ballot* at an election — affects more than the chances of a particular candidate); *Louisiana v. Fulton*, 337 So. 2d 866 (1976) (statute proscribing any person from publishing *any* statement concerning *any* candidate for election unless it is signed — not restricted to charges); *Massachusetts v. Dennis*, 368 Mass. 92, 329 N.E.2d 706 (1975) (statute making it a crime to write or distribute any circular designed *to aid or defeat* any candidate or *any question submitted to voters* without name of officer of organization or name of voter responsible — not limited to charges against candidates); *New York v. Duryea*, 76 Misc. 2d 948, 351 N.Y.S.2d 978 (statute makes anonymity a crime when anyone prints or distributes *any literature* in quantity containing *any statement* concerning any candidate *or issue on the ballot* in connection with any party or governmental action — not limited to charges or candidates), *order aff'd*, 44 A.D.2d 663, 354 N.Y.S.2d 129 (1974); *North Dakota v. Education Association*, 262 N.W.2d 731 (1978) (statute requires *all* political advertisements to disclose name of sponsor — not limited to charges or candidates); *Pennsylvania v. Wadzinski*, 492 Pa. 35, 422 A.2d 124 (1980) (statute proscribes any person from publishing *any statement* concerning any candidate for election without signature of person responsible — not limited to charges). Significantly we have found no case, state or federal, holding unconstitutional a statute with a prohibition drawn as narrowly as ours.

Finally, although the North Carolina Constitution holds freedom of speech and the press to be "great bulwarks of liberty" never

to be restrained, it also provides that "every person shall be held responsible for their abuse." N.C. Const. art. I, § 14. We believe the General Assembly has enacted section 163-274(7) in an effort to effect, by the narrowest possible means, the latter prong of this constitutional guarantee.

## V.

[5] Defendant next contends the trial court committed reversible error by incorrectly defining the essential elements of the statute in its instructions to the jury. We agree.

Section 163-274(7) requires that the jury find beyond a reasonable doubt that defendant published "a charge derogatory to a candidate or calculated to affect the candidate's chances of nomination or election." For all eleven counts against defendant the trial court instructed the jury that it must find beyond a reasonable doubt that defendant published:

> a charge *he intended* to be derogatory to a candidate for election to the Boone Town Council, or which he calculated would affect such candidate's chances of election and that such publication was not signed by the party giving publicity to and being responsible for such charge it would be your duty to return a verdict of guilty of this count. . . .

(Emphasis supplied.)

Prior to delivery of the verdict sheets to the jury, defendant timely objected to the trial court's instructions on the ground that the trial court had "switched over from an objective standard set forth in the statute to a subjective standard. . . ." *See* N.C. R. App. P. 10(b)(2) (party may not assign as error any portion of jury charge unless objection is made before jury retires to consider its verdict). The trial court overruled the objection, stating that it understood the statute to require a finding that defendant intended the charge to be derogatory to a candidate or intended the material to affect the candidate's chances for election.

Defendant argues that the trial court's charge erroneously included a scienter requirement while no such requirement is present in the statute. Conversely, the State contends that the trial court's instruction required the jury to find more than the statute required and therefore placed a heavier burden on the State to prove defendant's guilt. We agree with defendant and conclude

the trial court erroneously instructed the jury to defendant's prejudice, thus entitling him to a new trial.

"When [the trial court] undertakes to define the law, [it] must state it correctly." *State v. Earnhardt*, 307 N.C. 62, 70, 296 S.E.2d 649, 654 (1982). Failure to do so may be prejudicial error sufficient to warrant a new trial. *Id.* In *Earnhardt* defendant was convicted of being an accessory after the fact of voluntary manslaughter. *Id.* at 65, 296 S.E.2d at 651. One item of proof necessary for a conviction as accessory after the fact is that the defendant *knew* the felony had been committed by the person assisted. *Id.* at 69, 296 S.E.2d at 654. In instructing the jury, "the trial court stated that if defendant, 'knowing Horne and Lagree or Horne and Lagree *could* have committed the crime of voluntary manslaughter, assisted Horne or Lagree in escaping or attempting to escape detection, arrest or punishment by concocting a story which was not true . . . ,' then he should be found guilty." Upon review, this Court held that the trial court's instruction was reversible error. *Id.* at 70, 296 S.E.2d at 654. Even though this was the only error found in defendant's trial, the Court held that the instructions incorrectly defined a crucial element of the crime with which the defendant was charged and allowed for the possibility of confusion among the jurors. *Id.*

Here, as in *Earnhardt*, we believe the incorrect instruction was "too prejudicial to be hidden by the familiar rule that the charge must be considered contextually as a whole." *Id.* Section 163-274(7) is framed both objectively and subjectively. Objectively, it requires conviction if the jury determines beyond a reasonable doubt that the material published by defendant was a charge and that such charge was derogatory to a candidate. Whether a defendant believed or intended such material to be a charge derogatory is irrelevant. The jury's determination is not based on the state of mind of defendant, but on its objective interpretation of the publication. The statute also includes a subjective inquiry. It requires conviction if the jury finds beyond a reasonable doubt that the publication was "calculated to affect the candidate's chances of nomination or election."

We do not agree with the trial court's conclusion that defendant's state of mind is relevant to both inquiries. Rather, we conclude the legislature drafted this statute giving the jury two distinct grounds upon which to convict. The jury could find that the pub-

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

lished material was a derogatory charge, and it could find that the charge was "calculated" by defendant to affect a candidate's chances for nomination or election. Were the jury to find that defendant did not intend the published material to affect the candidate's electoral chances, it could only find defendant guilty of violating the statute if it were to find that the published materials contained a derogatory charge.

In the instant case defendant testified that at the time he mailed the offending materials he did not think candidates Chase or Miller would win the election in any event. Based on this testimony, the jury could have found that the published materials were not calculated by defendant to affect either candidate's chances for election. If such were the case, defendant only could have been convicted if the jury determined beyond a reasonable doubt that the charge was objectively derogatory. Because, however, of the trial court's erroneous instructions, the jury would have been required to convict defendant upon a finding beyond a reasonable doubt that defendant only intended the materials to be derogatory even if, objectively, the jury did not consider them to be so.

Because the trial court incorrectly instructed the jury regarding one of two possible theories upon which defendant could be convicted and it is unclear upon which theory or theories the jury relied in arriving at its verdict, we must assume the jury based its verdict on the theory for which it received an improper instruction. *State v. Lynch*, 327 N.C. 210, 393 S.E.2d 811 (1990) (submitting case to jury on alternative theories, including one not supported by evidence, was reversible error requiring new trial); *State v. Pakulski*, 319 N.C. 562, 574, 356 S.E.2d 319, 326 (1987) (possibility that felony murder conviction was based on predicate felony improperly submitted to jury warranted new trial); *State v. Belton*, 318 N.C. 141, 162-63, 347 S.E.2d 755, 768-69 (1986) (possibility that jury relied on unsupported theory to convict defendant required new trial); *Williams v. North Carolina*, 317 U.S. 287, 87 L. Ed. 279 (1942) (conviction cannot stand merely because it could have been supported by one theory submitted to jury if another invalid theory was also submitted and general verdict does not specify theory upon which verdict is based).

## VI.

[6] Defendant next contends the trial court's failure to exclude the testimony of candidates Chase and Miller relating out-of-court

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

declarations of others on the effect of the publications constituted prejudicial error. We conclude that the witnesses' testimony constituted inadmissible hearsay and should have been excluded. Because defendant is entitled to a new trial on other grounds, we express no opinion as to whether the admission of this testimony was reversible error.

During the presentation of the State's case, candidate Miller was directly examined as follows:

Q. Ma'am, the people who contacted you—you said a moment ago that there were several people who called you about the flyer?

A. Yes.

Q. The people who contacted you about the flyer, did they indicate it was helpful or hurtful to your election chances?

MR. WHITTLE: Your Honor, I OBJECT to that as calling for hearsay and it's opinion hearsay.

THE COURT: Well, you don't offer it for the truth of what was stated—

MR. WILSON: No, sir—

THE COURT: —but for what they said?

MR. WILSON: For what they said.

THE COURT: OVERRULED.

Q. Yes, ma'am, go ahead.

A. Ahh people asked if I had sent that out, and I said no I didn't. Ahh they were surprised, they thought maybe I had sent it out.

Q. But my question was, ma'am, did they indicate to you whether it was helpful or hurtful to your election chances?

MR. WHITTLE: OBJECTION to that.

A. Oh, they didn't think it was helpful—

THE COURT: OVERRULED.

A. They did not think it was helpful at all and they were quite surprised.

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

Q. How many people did you talk to concerning the flyer?

A. I think about eight people that evening.

MR. WHITTLE: MOVE TO STRIKE.

THE COURT: DENIED. .

Candidate Chase was examined similarly:

Q. Did you discuss, sir, with your supporters and with the voting public in Boone generally [the flyer concerning liquor by the drink]?

A. Not to as great an extent because it came later compared to the date of the election.

Q. Those that you did discuss it with, sir, did you find it helpful or derogatory to your candidacy?

MR. WHITTLE: OBJECTION, Your Honor.

THE COURT: OVERRULED.

A. That evening I only discussed it with one member of the public and he, and he found, he was, he was—the best that I can recall he said—

Q. Well, don't tell us what he said, but just whether or not he felt it was derogatory, whether or not you found it to be derogatory or helpful to your candidacy.

A. He found it to be derogatory.

MR. WHITTLE: OBJECTION.

THE COURT: OVERRULED.

MR. WHITTLE: MOVE TO STRIKE.

THE COURT: DENIED.

Under our Rules of Evidence, "[h]earsay is not admissible except as provided by statute or by these rules." N.C.G.S. § 8C-1, Rule 802 (1988); *State v. Patterson*, 332 N.C. 409, 420 S.E.2d 98 (1992). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1988). A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an asser-

tion." N.C.G.S. § 8C-1, Rule 801(a) (1992). Here, candidates Miller and Chase testified as to the actual opinions expressed by certain local residents out of court concerning whether the materials were derogatory and hurtful to the candidate's chances of being elected. We conclude these statements were admitted for the truth of what was said; therefore, they were inadmissible hearsay.

We further conclude the evidence does not fall within any recognized exception to the hearsay rule. The State contends the statements were admissible as lay witness opinion testimony under N.C.G.S. § 8C-1, Rule 701. We conclude these statements do not fall within the scope of Rule 701. Rule 701 allows a lay witness to testify as to his or her opinion if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear under-standing of his testimony or the determination of a fact in issue." N.C.G.S. § 8C-1, Rule 701 (1992). Here, Miller and Chase were not testifying as to their own opinions. Rather, both witnesses were repeating the out-of-court opinions expressed by non-testifying declarants. These opinions should have been subject to cross-examination by defendant. Because neither witness was testifying as to their own opinion, Rule 701 is inapplicable.

For the foregoing reasons the decision of the Court of Appeals vacating the judgment of the superior court is reversed. The case is remanded to the Court of Appeals for further remand to the superior court in order that defendant may be given a new trial.

REVERSED; REMANDED; NEW TRIAL.

Justice Parker did not participate in the consideration or deci-sion of this case.

Justice MITCHELL dissenting.

The majority errs in its conclusion that N.C.G.S. § 163-274(7) is a constitutionally permissible restriction on free expression. Although I agree that the State has an interest in preserving the integrity of the electoral process by promoting openness, hones-ty and fairness in the conduct of elections, I reject the majority's conclusion that this interest justifies the limitations on First Amend-ment rights imposed by this statute.

The statute at issue in the present case makes it a criminal offense *punishable by imprisonment* "[f]or any person to publish

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

in a newspaper or pamphlet or otherwise, any charge derogatory to any candidate or calculated to affect the candidate's chances of nomination or election, unless such publication be signed by the party giving publicity to and being responsible for such charge." N.C.G.S. § 163-274(7) (1991). The statute prohibits anonymous exposure in a public forum of truthful information about public figures. Therefore, it is a restriction on pure political expression which forms the innermost core of protected free speech. I have grave reservations as to whether, consistent with the First Amendment, any public purpose can justify such a limitation on pure political expression; I am convinced that the state interest advanced in the present case is insufficient to sustain the statute against this First Amendment challenge. Further, the definition that the majority has given the word "charge" as used in the statute, to include only accusations[1] of wrongdoing, guilt or blame, causes the statute to be an even more impermissible denial of First Amendment rights.

The majority acknowledges that the statute plainly places a restriction on publications which convey *truthful* information to the public about important public issues—the election of public officials. Such publications constitute pure political expression which is protected by the most basic tenets of the First Amendment to the Constitution of the United States.

In *N.A.A.C.P. v. Claiborne Hardware Co.*, the Supreme Court of the United States emphasized the importance of free debate of such public issues:

> This Court has recognized that expression on public issues "has always rested on the highest rung of the hierarchy of First Amendment values." Carey v Brown, 447 US 455, 467, 65 L Ed 2d 263, 100 S Ct 2286. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v Louisiana, 379 US 64, 74-75, 13 L Ed 2d 125, 85 S Ct 209. There is a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times Co.

---

1. The decision as to whether a publication is such an accusation and, thus, a "charge" will still lie in the eye of the beholder of the statement. Is a statement that a candidate is a "practicing heterosexual" or a statement that a candidate is a "known" communist a negative statement of the type amounting to a "charge" within the meaning of the statute? I leave such questions to the majority.

v Sullivan, 376 US 254, 270, 11 L Ed 2d 686, 84 S Ct 710, 95 ALR2d 1412.

458 U.S. 886, 913, 73 L. Ed. 2d 1215, 1236 (1982). As a result of this "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open," the Supreme Court has held that even *false* charges, when made in relation to a public figure and without knowledge of or reckless disregard for the statement's falsity, are protected by the First Amendment. *Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 99 L. Ed. 2d 41, 52-53 (1988); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686 (1964). The Supreme Court has done so because "erroneous statement is inevitable in free debate, . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *Sullivan*, 376 U.S. at 271-72, 11 L. Ed. 2d at 701 (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 433, 9 L. Ed. 2d 405, 418 (1963)). This nation is committed "to the principle that debate on public issues should be uninhibited, robust and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270, 11 L. Ed. 2d at 701.

James Madison emphasized the importance of unrestricted freedom of expression concerning candidates for public office when he stated the following in his Report on the Virginia Resolutions:

"Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively."

*Sullivan*, 376 U.S. at 275 n.15, 11 L. Ed. 2d at 703 n.15 (quoting 4 *Elliot's Debates on the Constitution* 575 (1876)). The Supreme Court of the United States also has recognized the importance of the right to freely discuss candidates for political office:

[D]ebate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution. . . . In a republic where the people are sovereign, the ability of the citizenry to make informed choices among

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

candidates for office is essential; for the identities of those who are elected will inevitably shape the course that we follow as a nation.

*Buckley v. Valeo*, 424 U.S. 1, 14-15, 46 L. Ed. 2d 659, 685 (1976) (per curiam). "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates." *Mills v. Alabama*, 384 U.S. 214, 218, 16 L. Ed. 2d 484, 488 (1966). " 'It can hardly be doubted that the constitutional guarantee has its *fullest and most urgent application* precisely to the conduct of campaigns for political office.' " *Buckley*, 424 U.S. at 14-15, 46 L. Ed. 2d at 685 (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 28 L. Ed. 2d 35, 41 (1971)) (emphasis added).

The right to anonymity has long been recognized in this country as a necessary component of the constitutional rights of free speech and a free press. In *Talley v. California*, the Supreme Court of the United States stressed that "[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." 362 U.S. 60, 64, 4 L. Ed. 2d 559, 563 (1960). Even before the Revolutionary War, many authors in England, including such well-known authors as Defoe, Swift, and Johnson, published anonymous pamphlets criticizing political affairs. Notes and Comments, *The Constitutional Right to Anonymity: Free Speech, Disclosure and the Devil*, 70 Yale L. Rev. 1084, 1085 (1961) (citing Courtney, *The Secrets of Our National Literature* 151-77 (1908)). By the time the First Amendment to the Constitution of the United States was proposed by Congress in 1789, anonymously published political criticisms were a familiar source of information.[2] *Id.* Both before and after the First Amendment became effective on 15 December 1791, the founders of this country often were compelled to exercise their

2. In *Talley*, the Supreme Court of the United States noted that "[b]efore the Revolutionary War colonial patriots frequently had to conceal their authorship or distribution of literature that easily could have brought down on them prosecutions by English-controlled courts. Along that time the Letters of Junius were written and the identity of their author is unknown to this day." 362 U.S. at 65, 4 L. Ed. 2d at 563.

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

*right* to criticize governmental officials *anonymously*. "[B]etween 1789 and 1809 no fewer than six presidents, fifteen cabinet members, twenty senators, and thirty-four congressmen published political writings either unsigned or under pen names." *Id.* (citing 4 *Beveridge, The Life of Marshall*, 313-19 (1919) ). Anonymous publications of that time included the following: The Federalist Papers, written by Alexander Hamilton, James Madison, and John Jay, which were originally published as letters to the editor and signed "Publius"; The Letters of Pacificus, written by Hamilton in defense of Washington's proclamation of neutrality, and Madison's responding Letters of Helvidius; and anonymous exchanges between Chief Justice Marshall, writing as "a friend to the Republic" and in defense of Supreme Court decisions, and Spencer Roane, who anonymously attacked certain Supreme Court decisions. *Id.* The Justices of the Supreme Court of the United States have demonstrated their firm grasp of such historical facts when repeatedly concluding that regulations requiring the disclosure of a speaker's identity are restrictions on the exercise of the right to free speech. *E.g., Hynes v. Mayor of Oradell*, 425 U.S. 610, 628-29, 48 L. Ed. 2d 243, 258 (1976) (Brennan, J., concurring) ("Restraints implicit in identification requirements, . . . extend beyond restrictions on time and place — they chill discussion itself."); *Talley*, 362 U.S. at 64, 4 L. Ed. 2d at 563 ("There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression."); *see Bates v. City of Little Rock*, 361 U.S. 516, 523, 4 L. Ed. 2d 480, 485 (1960) (" 'It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective . . . restraint on freedom of association.' " (quoting *N.A.A.C.P. v. Alabama ex rel. Patterson*, 357 U.S. 449, 462, 2 L. Ed. 2d 1488, 1499 (1958) ) ).

The type of communications restricted by N.C.G.S. § 163-274(7) — anonymous publications of "any charge derogatory to any candidate or calculated to affect the candidate's chances of nomination or election" — encompasses both true statements and honest misstatements of fact relating to public figures. Both of these types of statements are forms of core political expression which are entitled to the greatest protection provided by the First Amendment. The statute's requirement that "the party giving publicity to and being responsible for" such publications always either "sign" them or face imprisonment for failure to do so undoubtedly will prevent many individuals from exercising their constitutionally

protected right to attack a candidate with the truth.[3] Further-more, in addition to the deterrent effect of a disclosure requirement on the exercise of protected core political expression, "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley v. National Federation of the Blind*, 487 U.S. 781, 797, 101 L. Ed. 2d 669, 689 (1988). Both because N.C.G.S. § 163-274(7) chills the exercise of protected free expression and because it mandates the content of such expression, this statute is subject to "exacting First Amendment scrutiny." *Id.* at 797-98, 101 L. Ed. 2d at 690; *Buckley v. Valeo*, 424 U.S. at 18, 46 L. Ed. 2d at 687.

The statute at issue here, among other things, makes it a criminal offense punishable by imprisonment for any person to publish a *completely truthful* charge against any candidate for nomination or election to office, unless the person signs the publica-tion. N.C.G.S. § 163-274(7) (1991). As authoritatively construed by the majority, the statute does not prohibit anonymous publications praising candidates or otherwise not amounting to a charge of wrongdoing or an imputation of guilt or blame. Therefore, under any recognized constitutional test, the challenged statute is a *content-based* restriction on pure *political expression* in a *public forum. See, e.g., Boos v. Barry*, 485 U.S. 312, 99 L. Ed. 2d 333 (1988); Laurence H. Tribe, *American Constitutional Law*, § 12-2 (2d ed. 1988); Melville B. Nimmer, *Nimmer on Freedom of Speech; A Treatise on the First Amendment* § 2.04 (1984 & Supp. 1992); Susan H. Williams, *Content Discrimination and the First Amendment*, 139 U. Pa. L. Rev. 615 (1991). Accordingly, the statute "must be

---

3. Regardless of whether such fears are well founded, everyone who is not somnambulant knows that many citizens fear reprisals if they openly criticize those having positions of power over them. In his concurring opinion in *Hynes v. Mayor of Oradell*, 425 U.S. 610, 626, 48 L. Ed. 2d 243, 256 (1976), Justice Brennan noted that "Deplorably, apprehension of reprisal by the average citizen is too often well founded. The national scene in recent times has regrettably provided many in-stances of penalties for controversial expression in the form of vindictive harass-ment, discriminatory law enforcement, executive abuse of administrative powers, and intensive government surveillance." Another commentator has noted that "public identification with the unorthodox may bring with it substantial . . . pressures. Moreover, a citizen with a prudent concern for the future and a knowledge of history may feel these pressures even in times of relative tolerance." Seth F. Kreimer, *Sunlight, Secrets and Scarlet Letters: The Tension Between Privacy and Disclosure in Constitutional Law*, 140 U. Pa. L. Rev. 1, 87 (1991). As an example, Professor Kreimer refers to the recent successful use of the description "card carrying member of the ACLU" as an epithet in political discourse.

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

subjected to the most exacting scrutiny." *Boos v. Barry*, 485 U.S. at 321, 99 L. Ed. 2d at 345. The State must bear the burden of showing that the " 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.' " *Burson v. Freeman*, 504 U.S. ---, ---, 119 L. Ed. 2d 5, 14 (1992) (plurality opinion) (quoting *Perry Education Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 45, 74 L. Ed. 2d 794, 804 (1983) ). The Supreme Court of the United States has expressly emphasized that "it is the rare case in which . . . a law survives strict scrutiny." *Id.* at ---, 119 L. Ed. 2d at 22. This is no such "rare case."

In *Burson v. Freeman*, the Supreme Court of the United States recognized that it has "upheld generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Id.* at ---, 119 L. Ed. 2d at 15 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788, n.9, 75 L. Ed. 2d 547, 557-58, n.9 (1983) ). The statute under challenge in the present case, however, clearly is neither generally applicable nor evenhanded. As construed by the majority, the statute prohibits anonymous publication of truthful charges against a candidate, but does not reach the anonymous publication of untruthful praise for a candidate. Surely this statute cannot be an example of the sort of "generally applicable and evenhanded restrictions" protecting the integrity of the electoral process which the Supreme Court of the United States finds constitutionally acceptable.

In *Burson*, a decision relied upon by the majority here, the Supreme Court of the United States upheld a statute forbidding political campaigning at polling places on election day. In doing so, however, the plurality opinion for the Court expressly emphasized that the Court's "examination of the evolution of election reform, both in this country and abroad, demonstrates the necessity of restricted areas in or around polling places." *Id.* at ---, 119 L. Ed. 2d at 15. It is clear to me that no similar demonstration of necessity for the restrictions embodied in the statute under attack here has been or could be made.

In my view, the State has made nothing remotely approaching a showing in the present case that the statute at issue is *necessary* to serve a compelling state interest or that it is narrowly drawn to achieve that end. Instead, it is apparent to me that the statute in question, which prohibits anonymous but truthful charges against political candidates, falls within the class of statutes properly deemed

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

by the Supreme Court to be an "obvious and flagrant abridgement" of the rights guaranteed by the First Amendment. *Mills v. Alabama*, 384 U.S. at 219, 16 L. Ed. 2d at 488.

I agree that the State has a compelling interest in maintaining the integrity of the electoral process and in encouraging openness, honesty and fairness in elections. This state interest itself is grounded in one of the First Amendment's most fundamental purposes: to encourage unfettered discussion on the qualifications of candidates for public office in order to enable the citizenry to make informed choices among candidates. *See Buckley v. Valeo*, 424 U.S. at 14-15, 46 L. Ed. 2d at 685. However, the burdensome restrictions[4] of N.C.G.S. § 163-274(7) are not "necessary" to serve that interest and most certainly are not "narrowly drawn to achieve that end." The statute unconstitutionally tramples on the right to publish anonymously and, thus, freely on issues of public concern.

The State acknowledges in its brief before this Court that the purpose of the statute is to eliminate "the opportunity for

---

4. The restrictions at issue in the present case are significantly more burdensome than the individual disclosure requirement upheld in *Buckley v. Valeo*, 424 U.S. 1, 46 L. Ed. 2d 659 (1976). As construed, the regulation at issue in *Buckley* required individuals who were not candidates or political committees to report expenditures only when (1) they made contributions, in excess of $100, earmarked for political purposes or authorized or requested by a candidate or his agent, to some person other than a candidate or political committee; or (2) they made expenditures, in excess of $100, for communications that expressly advocated the election or defeat of clearly identified candidates. 424 U.S. at 80, 46 L. Ed. 2d at 722-23. The Court upheld this regulation on the basis that it furthered the governmental interests of stemming corruption in the election process and in disclosing candidates' supporters to the voters.

In the present case, the State asserts neither of the interests present in *Buckley* in support of N.C.G.S. § 163-274(7). Additionally, the *Buckley* regulation applied only to expenditures in excess of $100 either made at the behest of a candidate or used for communications "that *expressly advocated the election or defeat* of a clearly identified candidate." *See* 424 U.S. at 44 n.52, 46 L. Ed. 2d at 702 n.52 (Court held that this construction was necessary to prevent the statute's being unconstitutionally vague; restricts application of statute to communications containing express words of advocacy of election or defeat). The regulation at issue in the present case applies to any person publishing any derogatory "charge" *or* any "charge . . . calculated to affect the candidate's chances of nomination or election," regardless of the expense of the publication and regardless of whether the charge *expressly advocates* the election or defeat of the candidate. Furthermore, the regulation in *Buckley* did not require that communications be "signed" as does the regulation in the present case. *See Riley v. National Federation of the Blind*, 487 U.S. at 800-01, 101 L. Ed. 2d at 691-92 (requiring disclosure during communication itself is more burdensome than a requirement that a disclosure form be filed).

a person to remain hidden while disseminating derogatory material about a specific candidate." The State argues, and the majority of this Court agrees, that such a limitation is necessary, because a voter who reads anonymous, derogatory publications regarding a candidate "has no context within which to evaluate the bias of the source of anonymous information," and because "the candidate has no opportunity fully to rebut such material by showing the motives of the sender." The essence of the argument is that the statute in question will encourage openness in the election process by requiring that additional information — the identity of the publisher of any charge concerning a candidate for public office — be submitted to the voters. This argument fails to recognize the obvious and undeniable fact that the disclosure requirement will prevent many individuals from making truthful and highly relevant statements crucial to the public's ability to judge the qualifications of candidates for public office.[5] Rather than being necessary to encourage openness, honesty and fairness in the electoral process, the criminal statute at issue here frustrates those goals by *reducing* the amount of relevant truthful information about candidates for public office that will reach the voting public. Absent the right to criticize a candidate anonymously, some truthful messages "may never enter the marketplace of ideas at all." Kreimer, 140 U. Pa. L. Rev. at 87.

The statute as construed by the majority here will deter many individuals from publishing negative facts about a candidate which are clearly true and relevant to that candidate's fitness for public office. The State acknowledges that the statute has such an effect and even suggests that it is a *desirable* effect. The State points out in its brief before this Court that "disparaging and belittling material about a particular candidate may often be true; its very truthfulness can make it more derogatory and hurtful than lies." Although perhaps an accurate analysis, this is all the more reason

---

5. The following is a hypothetical example of a statement concerning a candidate's qualifications which might not be made as a result of the regulation at issue in the present case. Citizen X is an employee of Candidate Y and is aware that Y has participated in unethical practices. However, Y is a powerful member of the community and could effectively prevent X from finding other employment in the community. X fears losing her job if she openly criticizes Y but is even more afraid that she will be subjected to a criminal prosecution if she sends an anonymous letter or publishes some other form of anonymous communication truthfully describing Y's unethical conduct. X remains silent, and the voters elect Y without being aware of Y's unethical conduct.

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

why it is crucial to the openness and honesty of elections to give such information to the voting public. The truthful information will be harmful only if the voting public deems the information relevant to a candidate's fitness for office, and the public must have such information in order to make an informed selection at the polls. Rather than damaging the integrity of the electoral process, access to truthful but anonymous charges concerning a candidate clearly *promotes* that integrity by providing the public with more complete information about the candidate.

Despite the fact that the statute restricts individuals wishing to publish truthful but anonymous charges about political candidates and, thereby, places a limitation upon their exercise of First Amendment rights, the State has offered no evidence in support of its contention that disclosure of the author's identity is necessary to enable voters to evaluate the reliability or weight to be given such charges. One commentator, citing several studies indicating that voters are not at all subject to being so easily misled, has concluded, to the contrary, that "[i]t seems unlikely that our media-saturated electorate will be duped into self-destruction by nefarious forces" which are concealing their identities. Kreimer, 140 U. Pa. L. Rev. at 88.

The State has not shown that voters are more easily misled by anonymous statements than by statements which are attributed. However, even if it is assumed that voters are more likely to be misled by anonymous statements, the statute as interpreted by the majority permits an individual to make *laudatory* anonymous statements about a candidate freely. Therefore, the statute results in "viewpoint discrimination" and unquestionably is a "content-based" regulation of expression. *R.A.V. v. St. Paul*, 505 U.S. ---, 120 L. Ed. 2d 305 (1992). "The First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed. *Content-based regulations are presumptively invalid." Id.* at ---, 120 L. Ed. 2d at 317 (emphasis added). Therefore, for example, "the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government. *Id.* at ---, 120 L. Ed. 2d at 318. The State has offered no evidence showing that *false* anonymous statements *praising* a particular candidate are less damaging to the integrity of the electoral process than the truthful "charges" of wrongdoing by a candidate which are made imprisonable offenses by the statute. Indeed, it is inconceivable that any such

showing could be made. *See id.* The State has failed utterly to establish a rational basis for these distinctions under the statute, and it most certainly has failed to overcome the presumption of the invalidity of this content-based statute by making the required showing that such discrimination is *necessary* to insure open and fair elections and narrowly drawn to reach that end.

The State also has failed to show that disclosure of the author's identity is necessary to enable candidates to refute false statements. A candidate can rebut allegations contained in negative campaign material without knowing the identity of the author of that material. Furthermore, although the candidate may have difficulty showing the bias of an unidentified author, the fact that the author of a statement is unwilling to reveal his or her identity in itself serves to put every recipient of voting age on notice that the statement may be less believable than one which has been signed.

Finally, none of the State's purported justifications for the statute at issue explain why a requirement that *truthful* publications be signed is necessary to promote openness, honesty and fairness in the electoral process. It would seem that anonymous but truthful and relevant information about the candidates would promote rather than detract from that goal. The State has not shown that the criminal penalties imposed by N.C.G.S. § 163-274(7) are either "necessary" to promote any compelling interest or "narrowly drawn" to achieve any such end. To the contrary, the statute's requirements are "prophylactic, imprecise, and unduly burdensome." *Riley v. National Federation of the Blind*, 487 U.S. at 800, 101 L. Ed. 2d at 691.

In sum, the type of "danger" presented by the publication of a truthful anonymous statement about a candidate for public office which is an imprisonable criminal offense under the statute at issue " 'is precisely one of the types of activity envisioned by the Founders in presenting the First Amendment for ratification.' " *Landmark Communications v. Virginia*, 435 U.S. 829, 845, 56 L. Ed. 2d 1, 14 (1978) (quoting *Wood v. Georgia*, 370 U.S. 375, 388, 8 L. Ed. 2d 569, 579 (1962)). The statute criminalizes protected "core" or fundamental political expression of a type which cannot be prohibited and thereby violates the guarantees of the First Amendment to the Constitution of the United States.

Additionally, and of equal constitutional importance, this statute permits the imprisonment of a person solely because of the content

STATE v. PETERSILIE

[334 N.C. 169 (1993)]

of his or her anonymous publications criticizing a candidate. As authoritatively construed by the majority of this Court, the statute would permit a person to anonymously praise a candidate with impunity even if the praise is false. This criminal statute prohibiting anonymous expression about a candidate on the ground that its content includes a charge against the candidate is directly contrary to the principles of the First Amendment as quite clearly interpreted by a *majority* of the Supreme Court of the United States. *R.A.V. v. St. Paul*, 505 U.S. ---, 120 L. Ed. 2d 305.

Until today, I thought that no reasonable lawyer or judge would have imagined that a statute such as the one in question here could possibly pass First Amendment scrutiny. Obviously, I was wrong in this regard as my colleagues on this Court ordinarily are reasonable people.

Before the majority upholds this statute allowing defendants to be imprisoned for publishing political pamphlets such as those at issue in the present case, it would do well to recall the following words of James Madison, who understood as well as anyone ever has the evils which led to the adoption of the First Amendment:

> Some degree of abuse is inseparable from the proper use of every thing, and in no instance is this more true than in that of the press.

> It has accordingly been decided . . . that it is better to leave a few of its noxious branches to their luxuriant growth, than by pruning them away, to injure the vigor of those yielding the proper fruits.

*Renwick v. News and Observer*, 310 N.C. 312, 326, 312 S.E.2d 405, 413, *cert. denied*, 469 U.S. 858, L. Ed. 2d 121 (1984) (quoting 4 *Elliot's Debates on the Constitution* 571 (1876 Ed.)). I am convinced that Madison and the other founders of our nation believed that the First Amendment was adopted to prohibit the enactment of statutes precisely such as the one which the majority of this Court declares constitutionally acceptable in the present case.

The decision of the majority to uphold this flagrant violation of the First Amendment opens a sad chapter in the history of this Court. I can only pray that this chapter and the inevitable harm that will result to this State's people and their government will be brief.

For the foregoing reasons, I respectfully dissent from the decision of the majority.