STATE OF NORTH CAROLINA,
v.
MARY KIM LITTLE.
No. COA09-761.
Court of Appeals of North Carolina.
Filed: February 16, 2010.
This case not for publication
Attorney General Roy Cooper, by Special Deputy Attorney General Philip A. Telfer, for the State.
Thomas R. Sallenger for Defendant-Appellant.
McGEE, Judge.
A jury found Mary Kim Little (Defendant) guilty of voluntary manslaughter on 3 November 2008. Defendant was sentenced to an active term of 72 months to 96 months. Defendant appeals.
Defendant's boyfriend, Daniel Underhill (Underhill), testified at trial that he spent the night of 2 November 2006 with Defendant at Defendant's house. Upon waking on the morning of 3 November 2006, Defendant and Underhill smoked marijuana. Defendant and Underhill later left Defendant's house and picked up Billie Capps (Capps), and planned to use cocaine and Percocet. Defendant, Underhill, and Capps spent the day together using drugs. Sometime in the afternoon, Capps told Defendant and Underhill about a party that evening.
Defendant, Underhill, and Capps went to the house of José Enriquez (Enriquez) to "do cocaine and party." The four spent most of the evening "playing cards, having fun[,]" and dancing. Later, Enriquez went into a back room and called Defendant to join him. While Underhill and Capps continued to sit in the front room and talk, Defendant went into the back room with Enriquez. A short time later, Underhill heard Defendant scream.
Underhill found Enriquez holding Defendant by her hair, and Enriquez's "pants were undone." Defendant and Enriquez were exchanging blows to the face and Underhill ran to intervene. Underhill testified that, as he turned around, he felt something hit him in the back. He later realized that Capps was stabbing him in the back. Underhill turned to fight Capps, beating Capps about the head and "dragging him through the house." Capps stabbed Underhill thirteen times. During this time, Enriquez and Defendant continued to struggle. Enriquez "had [Defendant] by [her] hair slinging her around, slinging her into stuff."
After struggling for some time, Capps retreated and sprayed mace into Underhill's mouth and face. Underhill testified that "every time [he] was trying to breathe[,] blood was coming out [of his] mouth." Underhill made his way towards the back of the house to escape through the back door, but he fell in the kitchen after Capps again sprayed mace in his face. Defendant came into the kitchen after Underhill, and she covered Underhill's body with a plastic bag to try to stop the bleeding. Underhill saw Enriquez kick Defendant in the face. Enriquez then "looked down," saw Underhill, and "freaked out[.]" Underhill testified that he thought Enriquez had been unaware that Capps had been stabbing Underhill. Enriquez "dropped down" and told Underhill to wake up. During this time, Defendant was lying on the floor near Underhill and Capps was hiding. Underhill heard Enriquez tell Defendant to get trash bags because Underhill was bleeding very badly. Enriquez was kneeling over Underhill, and Underhill thought "[Enriquez] was going to try to stop [Underhill's] bleeding."
Underhill testified that he then saw a "knife go through [Enriquez's] throat[,]" and that Defendant was holding the knife. Enriquez fell over and Underhill "knew [Enriquez] was dying." Underhill asked Defendant "why she had done that; that she had got [sic] the wrong person." Defendant replied, "I thought I got the right person."
Defendant testified at trial that after she saw Underhill lying on the floor, she was kicked in the face. She then found a knife and stabbed Enriquez. Defendant testified that after she stabbed Enriquez in the back, he fell over and she did not stab him any more. Defendant then called Carla Lee (Lee), Underhill's mother, for help. While Defendant was on the phone with Lee, Capps came out and began to spray mace "right in [Underhill's] mouth." Lee told Defendant over the phone to: "Just [s]top [Capps]. . . Get something and knock him off." Defendant could not see clearly or breathe because of the mace in the air and because she had been drinking alcohol and doing drugs.
Defendant carried Underhill outside and was met by law enforcement officers and EMS personnel. Defendant was handcuffed and placed in the back of a police car, but Underhill refused treatment until Defendant was removed from the police car. Defendant and Underhill were taken to a hospital and Defendant was found to have suffered a broken cheek and nose.
After Defendant was released from the hospital, she was taken to the Sheriff's Office by Detective Michael Kabler. Detective Kabler told Defendant she was not under arrest, but that he needed to talk to her. Defendant told Detective Kabler that her name was "Amy Little" because she "was scared". The next day, Defendant called Detective Kabler and told him she had lied to him about her name. Defendant had given Detective Kabler a statement that was unclear as to whether it was Capps or Enriquez who had tried to rape Defendant. When asked, "[w]hy is this statement this way?" Defendant replied that she did "not know."
Lee testified at trial that, when she saw Defendant at the hospital, Defendant had two black eyes, bruises on her arms, and a cut on her back. Lee further testified that Capps was at the same hospital as Defendant and Underhill. Defendant and Lee saw Capps and Defendant told Lee: "That's [Capps]. He tried to rape me." Lee also testified that while Underhill was at the hospital receiving treatment, he told her "[Capps] tried to rape [Defendant]." Lee testified that Underhill later told her that it had actually been Enriquez who had tried to rape Defendant.
Dr. Thomas Clark, a forensic pathologist and medical examiner for the State, testified that he performed an autopsy on Enriquez. Dr. Clark found "multiple sharp force injuries" on Enriquez's body that were "produced with a knife or an object that's like a knife[.]" Dr. Clark described a total of seven injuries on Enriquez's neck, hands, face, and back. Dr. Clark "attributed the cause of death to multiple stab wounds to the back." Of the two wounds on Enriquez's back, Dr. Clark testified that the upper wound "[was] the more serious one[,]" and that the lower wound "could have been fatal, and probably would have been eventually, but compared to the one above it, [was] not as significant."
Defendant "moved to dismiss" at the close of the State's evidence and again at the close of all the evidence. The trial court denied Defendant's motions and instructed the jury on second-degree murder, voluntary and involuntary manslaughter, self-defense, and defense of others. Defendant was convicted of voluntary manslaughter. Defendant appeals.

Motion to Dismiss
Defendant argues that the trial court erred by denying her motions to dismiss the charges of second-degree murder, voluntary and involuntary manslaughter, and any lesser included offenses. Defendant contends there was insufficient evidence of each element of the offenses charged and of Defendant's being the perpetrator. We disagree.
We review a lower court's ruling on a motion to dismiss to determine whether there was "substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." State v. Powell, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." State v. Crawford, 344 N.C. 65, 73, 472 S.E.2d 920, 925 (1996) (citation omitted). We must consider "all evidence in the light most favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence." State v. Garcia, 358 N.C. 382, 412-13, 597 S.E.2d 724, 746 (2004), cert. denied, 543 U.S. 1156, 161 L. Ed. 2d 122 (2005) (citation omitted). "Any contradictions or discrepancies in the evidence are for the jury to resolve and do not warrant dismissal." State v. Olson, 330 N.C. 557, 564, 411 S.E.2d 592, 595 (1992)(citation omitted).
Defendant contends that the jury's guilty verdict implied a finding that Defendant "had a reasonable belief that she needed to use deadly force to avoid death or serious injury. . . . Implicit as well, the jury must have determined that [Defendant] used excessive force and was therefore guilty of voluntary manslaughter under the theory of imperfect self-defense." Defendant contends there was no evidence offered at trial which supported the theory of imperfect self-defense.
"[V]oluntary manslaughter is an intentional killing without premeditation, deliberation or malice but done in the heat of passion suddenly aroused by adequate provocation or in the exercise of imperfect self-defense where excessive force under the circumstances was used or where the defendant is the aggressor." State v. Wallace, 309 N.C. 141, 149, 305 S.E.2d 548, 553 (1983) (citation omitted).
Our Supreme Court stated in State v. Lyons, that perfect self-defense arises when
(1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and
(2) defendant's belief was reasonable in that the circumstances as they appeared to him at that time were sufficient to create such a belief in the mind of a person of ordinary firmness; and
(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and
(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.
State v. Lyons, 340 N.C. 646, 661, 459 S.E.2d 770, 778 (1995) (citations omitted). The Court further stated: "Imperfect self-defense renders a defendant guilty of at least voluntary manslaughter if the first two elements above exist at the time of the killing but the defendant, without murderous intent, either was the aggressor in bringing on the affray or used excessive force." Id. Our Supreme Court recently addressed the issue of self defense and defense of another in State v. Moore, ___ N.C. ___, ___ S.E.2d ___ 2010 WL 325376 (29 Jan. 2009):
The law related to defense of another or a family member is substantially similar[:] . . . In general one may kill in defense of another if one believes it to be necessary to prevent death or great bodily harm to the other and has a reasonable ground for such belief, the reasonableness of this belief or apprehension to be judged by the jury in light of the facts and circumstances as they appeared to the defender at the time of the killing.
Id. at ___, ___ S.E.2d at ___, 2010 WL 325376 at *3 (citations omitted).
Defendant first argues that:
In order for [the] jury to have found voluntary manslaughter under the theory of imperfect self-defense, it must necessarily have found the first two elements in that [Defendant] had a reasonable belief under the circumstances at the time that it was necessary to kill [Enriquez] in order to save herself and/or [Underhill] from death or great bodily harm.
In her argument, Defendant relies on State v. McAvoy, 331 N.C. 583, 417 S.E.2d 489 (1992); State v. Woods, 278 N.C. 210, 179 S.E.2d 358 (1971); and State v. Burden, 36 N.C. App. 332, 244 S.E.2d 204 (1978). Defendant contends that, where one reasonably believes that the use of deadly force is necessary to prevent death or great bodily harm, the use of deadly force is not excessive.
Defendant's reliance on these cases is misplaced. In Woods, the defendant was convicted of voluntary manslaughter. Our Supreme Court summarized the defendant's evidence as follows:
Defendant's evidence (her testimony) tended to show that after scuffling with [the victim] over the rifle on the front porch of their residence she got possession of the weapon and went into the house; that [the victim] said he was going to take the rifle from her and, despite her warning to him not to come in, he started into the house; that, because he had previously shot her, she was afraid of him, and she "shot to miss him and hit him"; that her only purpose in shooting was to scare him. All the evidence, therefore, tends to show that defendant intentionally fired the shot which struck [the victim].
Woods, 278 N.C. at 216, 179 S.E.2d at 362. The Supreme Court made the following observation and holding:
In the mandate, the judge instructed the jurors to return a verdict of involuntary manslaughter in the event defendant satisfied them she shot [the victim] in the reasonable belief "that the shooting of the deceased was necessary in order to save herself from death or great bodily harm" but failed to satisfy them that the force she used was not excessive under the circumstances. Obviously this charge incorporates contradictions. If defendant had reasonable grounds to believe that it was necessary to shoot [the victim] to save herself from death or great bodily harm, she did not use excessive force in shooting him. Furthermore, when one who is fighting in self-defense uses excessive force he is guilty of voluntary manslaughter. There was in this case no evidence which would have justified a verdict of involuntary manslaughter.
Id. at 217-18, 179 S.E.2d at 363 (citations omitted, emphasis in the original).
In Burden, the defendant shot and killed his wife after they separated, when the victim began dating another man. Burden, 36 N.C. App. at 333, 244 S.E.2d at 204. The defendant encountered the victim and her boyfriend while driving, and he used his vehicle to block their passage. Id., 244 S.E.2d at 205. The defendant's evidence tended to show that he saw the boyfriend waving something out the window of his car and that the defendant heard gunshots. Id. The defendant shot at the car in which the victim and the boyfriend were riding, killing the victim. Id. at 334, 244 S.E.2d at 205.
The defendant was convicted of second-degree murder and argued on appeal that the trial court erred by failing to submit to the jury an instruction on voluntary manslaughter. Id. Our Court held that
the trial judge was not required to submit the offense of voluntary manslaughter to the jury unless there was evidence from which the jury could find that in defending himself the defendant used excessive force. We think that the defendant's testimony, which provided the sole basis for his defense of self-defense, discloses that he used only such force as was necessary to defend himself under the circumstances which he recounted. If the jury found that the defendant reasonably believed that he was in danger of death or great bodily harm from the shots which he heard, then it follows that his only reasonable defense was to shoot back. Thus, since there was no evidence of excessive force, the trial judge was not required to submit the offense of voluntary manslaughter to the jury.
Id. at 336, 244 S.E.2d at 206 (citation omitted).
In McAvoy, the third case Defendant cites, the defendant was convicted of first-degree murder. The victim was in a club where the defendant tended bar. McAvoy, 331 N.C. at 587, 417 S.E.2d at 492. The defendant and the victim confronted each other about a relationship the defendant was having with the victim's wife. Id. With the bar in between them, the defendant drew a gun and pointed it at the victim's head. Id. The victim slapped at the gun and told the defendant to shoot him. Id. The defendant then shot and killed the victim. Id.
The trial court instructed the jury on self-defense and the defendant argued on appeal that the instructions were conflicting, in that elements two and four of self-defense were "legally equivalent" and should have led to identical verdicts. Id. at 5959-7, 417 S.E.2d at 497-98. Our Supreme Court summarized the defendant's argument as follows:
"If the jury finds that defendant killed the victim under an honest but unreasonable belief that killing the victim was necessary to protect the defendant from imminent death or great bodily harm, the use of deadly force was necessarily excessive (and thus not in perfect self-defense), but the sincerity of defendant's belief negates malice, an essential element of murder. Therefore, upon such a finding, defendant may be convicted of voluntary manslaughter but not murder."
Id. at 597, 417 S.E.2d at 498. The Court held that there was no error in the trial court's instruction on imperfect self-defense, ruling that the defendant's argument
conflicts with the long line of cases which hold that the State's disproof of element two permits a conviction of murder, while the State's disproof only of element four results in manslaughter. Therefore, to the extent that the four cases upon which defendant relies, i.e., Jones, Clay, Woods, and Thomas, may be read to require that a jury be instructed that it should return a verdict of manslaughter rather than murder if it finds that defendant killed the victim under an honest but unreasonable belief that deadly force was necessary, these cases are disapproved.
Id. at 601, 417 S.E.2d at 500. In so holding, the Supreme Court also addressed Woods:
There was evidence in Woods tending to show that defendant shot twice in the direction of the victim, intending to scare him. Under these circumstances, the Court's comment that defendant did not use excessive force in shooting the victim if she had reasonable grounds to believe that it was necessary to shoot him to save herself from death or great bodily harm seems to be correct. Thus, it would seem unnecessary in this fact situation, to give the fourth element of the self-defense instruction. However, this does not speak to defendant's contention here that an honest but unreasonable belief that deadly force is necessary will reduce murder to manslaughter.
Id. (emphasis in the original).
The Court therefore determined in McAvoy that self-defense elements two and four  that a defendant reasonably believes deadly force is necessary to prevent imminent death or serious bodily harm and that the defendant does not use excessive force  are not identical. See also State v. Richardson, 341 N.C. 585, 589, 461 S.E.2d 724, 727 (1995) (examining McAvoy and noting that "[The Supreme] Court rejected defendant's argument and determined that elements two and four are not legally equivalent."). Therefore, McAvoy, Woods, and Burden do not support Defendant's contention that, upon finding that a defendant acted on a reasonable belief that deadly force was necessary to prevent great bodily harm or injury, a jury could not find that the defendant used excessive force. To the extent that Woods allows a trial court to omit an instruction on voluntary manslaughter on grounds that there was no evidence of the use of excessive force, McAvoy is clear that "[that] fact situation" rendered the instruction unnecessary. McAvoy, 331 N.C. at 601, 417 S.E.2d at 500 (emphasis in the original).
Thus, the issue before us is whether there was substantial evidence to support each element of a charge of voluntary manslaughter. If there was substantial evidence of each element of voluntary manslaughter, the trial court did not err in denying Defendant's motion to dismiss. Powell, 299 N.C. at 98, 261 S.E.2d at 117.
As discussed above, voluntary manslaughter may arise upon an intentional killing "done in the heat of passion suddenly aroused by adequate provocation or in the exercise of imperfect self-defense where excessive force under the circumstances was used or where the defendant is the aggressor." Wallace, 309 N.C. at 149, 305 S.E.2d at 553 (citation omitted). A heat of passion sufficient to render an intentional killing manslaughter may be aroused by "an assault or threatened assault[.]" State v. Forrest, 321 N.C. 186, 193, 362 S.E.2d 252, 256 (1987) (citations omitted). Excessive force is "more force than was reasonable under the circumstances." State v. Potts, 334 N.C. 575, 581, 433 S.E.2d 736, 739 (1993).
Defendant challenges the State's theory that Defendant used excessive force and argues that "the six or seven stab wounds inflicted by [Defendant] cannot reasonably be found excessive." The State counters, arguing that the evidence at trial supported voluntary manslaughter under either a heat of passion or an excessive force theory. We agree with the State's contention.
The evidence at trial, taken in the light most favorable to the State, tended to show that either Enriquez or Capps attempted to rape Defendant. Capps stabbed Underhill several times, and Underhill appeared to be bleeding to death. Enriquez kneeled over Underhill with his back to Defendant and assisted Underhill by attempting to stop the bleeding. Defendant then stabbed Enriquez seven times, two of which were "serious" wounds to Enriquez's back, sufficient to cause death. We find this was substantial evidence that Defendant intentionally killed Enriquez, but either did so out of a heat of passion aroused by the legally recognized provocation of assault or used excessive force in self-defense or the defense of Underhill. We, therefore, hold that the trial court did not err in denying Defendant's motion to dismiss the voluntary manslaughter charge. Defendant makes no argument with respect to the charge of second-degree murder and, therefore, we do not address that charge.

Conviction on an Improper Theory
Defendant next argues that "[b]ecause the jury may have convicted [Defendant] under [the improper] theory [of imperfect self-defense], she is entitled to a new trial." Defendant cites State v. Petersilie, 334 N.C. 169, 193, 432 S.E.2d 832, 846 (1993) (ordering a new trial where a trial court gave improper instructions for "one of two possible theories upon which defendant could be convicted and it is unclear upon which theory or theories the jury relied in arriving at its verdict, [because] we must assume the jury based its verdict on the theory for which it received an improper instruction."). In the present case, because we have held that the jury could have properly convicted Defendant under either theory of voluntary manslaughter, we find Petersilie inapplicable and overrule this assignment of error.
No error.
Judges STEELMAN and STEPHENS concur.
Report per Rule 30(e).