LIBERTARIAN PARTY OF NORTH CAROLINA; SEAN HAUGH, as Executive Director of the Party; PAMELA GUIGNARD and RUSTY SHERIDAN, as Libertarian candidates for Mayor of Charlotte, North Carolina; JUSTIN CARDONE and DAVID GABLE, as Libertarian candidates for Charlotte City Council; RICHARD NORMAN and THOMAS LEINBACH, as Libertarian candidates for Winston-Salem City Council; and JENNIFER SCHULZ, as a registered voter, Plaintiffs, and THE NORTH CAROLINA GREEN PARTY; ELENA EVERETT, as Chair, and KAI SCHWANDES, as Co-Chair of the Party; NICHOLAS TRIPLETT, as a prospective North Carolina Green Party candidate for public office; HART MATTHEWS and GERALD SURH, as members of the Party and qualified voters, Intervenors v. STATE OF NORTH CAROLINA; ROY COOPER, as Attorney General of the State of North Carolina; NORTH CAROLINA STATE BOARD OF ELECTIONS; and GARY O. BARTLETT, as Executive Director of the North Carolina State Board of Elections, Defendants

No. 479A09

(Filed 11 March 2011)

**1. Appeal and Error— preservation of issues—failure to argue**

The only issue for Supreme Court consideration was whether the signature requirement for party recognition violates Article I, sections 12, 14, and 19 of the North Carolina Constitution. Appellants abandoned at the Court of Appeals arguments concerning other sections of the state constitution as well as arguments pertaining to N.C.G.S. §§ 163-96(a)(1) and 163-97.1.

**2. Elections— equal protection—ballot access restrictions— political parties—associational rights—signature requirement**

A *de novo* review revealed the Court of Appeals erred in applying strict scrutiny, but correctly concluded that the signature requirement for party recognition on the ballot under N.C.G.S. § 163-96(a)(2) does not violate Article I, Section 12, 14, or 19 of the Constitution of North Carolina. The two percent party recognition requirement may burden minor political parties somewhat, but it does not impose a severe burden. When a State ballot access provision does not severely burden associational rights, the interests of the State need only be sufficiently weighty to justify the limitation imposed on the party's rights.

Justice JACKSON did not participate in the consideration or decision of this case.

Justice NEWBY dissenting.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, —— N.C. App. ——, 688 S.E.2d 700 (2009), affirming an order entered 27 May 2008 by Judge Robert H. Hobgood in Superior Court, Wake County. On 28 January 2010, the Supreme Court retained plaintiffs and intervenors' notice of appeal as to a substantial constitutional question pursuant to N.C.G.S. § 7A-30(1). Heard in the Supreme Court on 9 September 2010.

*Tharrington Smith, L.L.P., by Kenneth A. Soo and Adam S. Mitchell, for plaintiff-appellants; and Elliot Pishko Morgan, P.A., by Robert M. Elliot, and American Civil Liberties Union of North Carolina Legal Foundation, by Katherine Lewis Parker, for intervenor-appellants.*

*Roy Cooper, Attorney General, by Alexander McC. Peters Special Deputy Attorney General, for defendant-appellees.*

*Allison J. Riggs for Southern Coalition for Social Justice, Democracy North Carolina, FairVote Action, League of Women Voters—North Carolina, Common Cause North Carolina, North Carolinians for Free and Proper Elections, and the John Locke Foundation, amici curiae.*

*Jason B. Kay and Robert F. Orr for North Carolina Institute for Constitutional Law, amicus curiae.*

TIMMONS-GOODSON, Justice.

This is a case of first impression that requires us to decide whether the ballot access requirements of N.C.G.S. § 163-96(a)(2) violate Article I, Section 12, 14, or 19 of the Constitution of North Carolina. We hold that N.C.G.S. § 163-96(a)(2) is constitutional with respect to Article I, Sections 12, 14, and 19 and adopt the United States Supreme Court's analysis for determining the constitutionality of ballot access provisions. Accordingly, we modify and affirm the opinion of the Court of Appeals.

## BACKGROUND

On 21 September 2005, the Libertarian Party of North Carolina ("N.C. Libertarian Party") filed a complaint against North Carolina's State Board of Elections seeking a declaratory judgment to resolve whether North Carolina's ballot access statutes violate certain rights under the Constitution of North Carolina. The N.C. Libertarian Party also sought recognition as a political party and injunctive relief to

keep its candidates on the ballots in various 2005 municipal elections. On 27 April 2006, the North Carolina Green Party ("N.C. Green Party") was allowed to intervene. The trial court conducted a nonjury trial for which the parties stipulated to the following facts:

A.  Historically, states, including North Carolina, have imposed requirements on political parties to gain and retain recognition for their parties and their affiliated candidates.

B.  To gain recognition in North Carolina, a political party has been required to submit a petition with the signatures of a number of registered voters supporting the recognition of that party; once a party has obtained recognition as a political party, its candidates have been listed on ballots throughout North Carolina.

C.  From 1935 through 1981, the North Carolina signature requirement was 10,000 registered voters. North Carolina Code of 1935 § 5913.

. . . .

H.  In 1983, the General Assembly increased the number of registered voter signatures required for recognition of a new political party ["recognition requirement"] . . . to two percent of the number who voted in the last gubernatorial election. 1983 Sess. Laws C. 576, § 1. Parties who are seeking recognition as political parties in North Carolina may begin gathering these signatures as soon as the gubernatorial election is over.

I.  For the 2008 election, a party [had to] submit 69,734 signatures from registered voters in order to gain recognition as a political party pursuant to N.C.G.S. § 163-96. These signatures [had to] be submitted to the State Board of Elections by the first day of June.

J.  The population of North Carolina, the number of registered voters in North Carolina, the number of voters who vote in North Carolina's gubernatorial elections and, consequently, the number of signatures required to gain recognition as a political party have steadily increased from 1996 to the present [2008]. . . . As of April 12, 2008, 5,733,762 persons were registered to vote in North Carolina. This being so, the number of signatures required for recognition as a political

party—69,734—is 1.21% of the total registered voters in North Carolina as of April 12, 2008.

K. In order to retain recognition, a political party has historically been required to receive a threshold percentage of the votes cast statewide in the most recent gubernatorial or presidential election.

L. From 1935 to 1949, the ballot retention requirement was 3% of the statewide vote. North Carolina Code of 1935 § 5913.

. . . .

N. In the [1949] legislative session, the General Assembly raised the ballot retention requirement to 10% of the statewide vote.

O. Only one party other than the Democratic or Republican Party, the American Party in 1968, has ever met the 10% requirement. The Democratic and Republican Parties are the only two political parties to maintain continuous recognition since the enactment of N.C.G.S. §§ 163-96 and -97.

P. Effective January 1, 2007, after the filing of this action on September 21, 2005, the General Assembly amended N.C.G.S. § 163-96 to lower the retention requirement to 2%. 2006 Sess. Laws C. 234, §§ 1 and 2.

Q Once a political party is officially recognized, under [N.C.G.S.] § 163-96 its candidate must receive at least 2% of the statewide vote for governor or president for the party to remain officially recognized and for its candidates to be listed on the ballot for any office anywhere in the state ["retention requirement"]. Thus, even if candidates of the party receive more than two percent of the vote in a particular city or county, they cannot be listed on the ballot and their party identified in ballots in that community if the party did not receive two percent of the vote statewide.

. . . .

LL Persons desiring to get on the ballot in North Carolina can also qualify as unaffiliated candidates pursuant to N.C.G.S. § 163-122 and as write-in candidates pursuant to N.C.G.S. § 163-123, though in neither circumstance will the candidate's political party appear with a party label. N.C.G.S. § 163-122

requires unaffiliated candidates for statewide office to submit signatures of registered voters equal to two percent of the voters who voted in the most recent gubernatorial election; for district or local offices, signatures equal to four percent of the registered voters in that district or locality must be submitted. N.C.G.S. § 163-123 requires write-in candidates for statewide office to submit 500 signatures of registered voters.

The parties also stipulated that the N.C. Libertarian Party has continuously existed since 1976 and has achieved recognition as a political party in most state elections since then by using the petition process set forth in N.C.G.S. § 163-96(a)(2). In contrast, the N.C. Green Party has never met the petition requirements, gained recognition as a political party under section 163-96, or received the benefits of party recognition.

On 27 May 2008, the trial court entered judgment for defendants. The North Carolina Court of Appeals issued a divided opinion on 20 October 2009 holding no error in the trial court's judgment. The N.C. Libertarian Party and the N.C. Green Party come to this Court with a notice of appeal based upon a dissent and a constitutional question.

[1] Appellants ask this Court to determine whether Article I, Sections 1, 12, 10, 14, and 19, as well as Article VI, Sections 1 and 6, of the Constitution of North Carolina are violated by various statutes constituting North Carolina's ballot access framework. At the Court of Appeals, however, appellants abandoned arguments concerning all sections of the state constitution except Article I, Sections 12, 14, and 19. *Libertarian Party of N.C. v. State*, —— N.C. App. ——, ——, 688 S.E.2d 700, 706 (2009) (concluding that appellants abandoned arguments implicating Article I, Sections 1 and 10, and Article VI, Sections 1 and 6). There, appellants also abandoned arguments pertaining to N.C.G.S. §§ 163-96(a)(1) and 163-97.1.[1] *Id.* at ——, 688 S.E.2d at 706. Because appellants do not take issue with the determination of the Court of Appeals that these constitutional and statutory claims were

---

1. In their brief to this Court, appellants allege the unconstitutionality of additional election law provisions. However, appellants abandoned those claims by failing to provide in their brief a "reason or argument" to explain the purported unconstitutionality. N.C. R. App. P. 28(b)(6) (2008). The additional provisions include, *inter alia*, unfavorable placement on the ballot of candidates from parties other than the two major political parties, N.C.G.S. § 163-165.6 and the prohibition against a political party allowing registered voters of other parties to vote in its primary, *id.* §§ 163-59, -119.

abandoned, those claims are not before this Court. The only issue for our consideration, then, is whether the signature requirement for party recognition under N.C.G.S. § 163-96(a)(2) violates Article I, Section 12, 14, or 19 of the Constitution of North Carolina. We review this matter de novo. *Piedmont Triad Reg'l Water Auth. v. Sumner Hills, Inc.*, 353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001) ("[D]e novo review is ordinarily appropriate in cases where constitutional rights are implicated." (citations omitted)).

## ANALYSIS

### I.

[2] For the first time, this Court is asked to review the constitutionality of N.C.G.S. § 163-96(a)(2) under our state constitution. Defining "political party," the statute provides as follows:

(a) Definition.—A political party within the meaning of the election laws of this State shall be either:

(1) Any group of voters which, at the last preceding general State election, polled for its candidate for Governor, or for presidential electors, at least two percent (2%) of the entire vote cast in the State for Governor or for presidential electors; or

(2) Any group of voters which shall have filed with the State Board of Elections petitions for the formulation of a new political party which are signed by registered and qualified voters in this State equal in number to two percent (2%) of the total number of voters who voted in the most recent general election for Governor. Also the petition must be signed by at least 200 registered voters from each of four congressional districts in North Carolina. To be effective, the petitioners must file their petitions with the State Board of Elections before 12:00 noon on the first day of June preceding the day on which is to be held the first general State election in which the new political party desires to participate. The State Board of Elections shall forthwith determine the sufficiency of petitions filed with it and shall immediately communicate its determination to the State chairman of the proposed new political party.

N.C.G.S. § 163-96(a) (2009).[2] Appellants contend the right to ballot access is a fundamental right warranting strict scrutiny. Ultimately, appellants believe N.C.G.S. § 163-96(a)(2) fails strict scrutiny because the State has not shown the statute to be narrowly tailored to advance a compelling state interest. We are not persuaded.

When interpreting the Constitution of North Carolina, we are not bound by federal court rulings, so long as our decision comports with the United States Constitution. *State ex rel. Martin v. Preston*, 325 N.C. 438, 449-50, 385 S.E.2d 473, 479 (1989) (citations omitted). When it comes to determining the constitutionality of ballot access provisions, we find the Supreme Court's analysis in *Timmons v. Twin Cities Area New Party* and its progeny compelling. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451-52, 170 L. Ed. 2d 151, 161-62 (2008); *Clingman v. Beaver*, 544 U.S. 581, 586-87, 161 L. Ed. 2d 920, 930 (2005) (plurality); *Cal. Democratic Party v. Jones*, 530 U.S. 567, 581-82, 147 L. Ed. 2d 502, 514 (2000); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357-59, 137 L. Ed. 2d 589, 597-98 (1997).

In *Twin Cities*, the Supreme Court considered whether Minnesota's antifusion laws[3] violated a minor party's First and Fourteenth Amendment associational rights. *Id.* at 354-55, 137 L. Ed. 2d at 595-96. The Court reasoned that if these rights were severely burdened, the challenged statutes must be strictly scrutinized to determine whether they were "narrowly tailored and advance a compelling state interest." *Id.* at 358, 137 L. Ed. 2d at 598. If the rights were not severely burdened, the interests of the State "need only be sufficiently weighty to justify the limitation imposed on the party's rights." *Id.* at 364, 137 L. Ed. 2d at 601 (internal quotation marks omitted) (citing *Burdick v. Takushi*, 504 U.S. 428, 434, 119 L. Ed. 2d 245, 254 (1992), and *Norman v. Reed*, 502 U.S. 279, 288-89, 116 L. Ed. 2d 711, 723 (1992)). To make this sufficiency determination, the court weighs "the character and magnitude of the burden the State's rule imposes on [associational] rights against the interests the State contends justify that burden, and consider[s] the extent to which the State's concerns make the burden necessary." *Id.* at 358, 137 L. Ed. 2d at 598 (citations and

2. Subsection (a) of the statute is almost exactly the same today as it was when this litigation was initiated in 2005. The only exception is the reduction of the retention requirement of subsection (a)(1) from ten percent to two percent effective 1 January 2007. Act of July 26, 2006, ch. 234, sec.1, 2006 N.C. Sess. Laws 1018, 1018.

3. Antifusion laws prohibit "the nomination by more than one political party of the same candidate for the same office in the same general election." *Twin Cities*, 520 U.S. at 354 n.1, 137 L. Ed. 2d at 595 n.1 (citation omitted).

internal quotation marks omitted). Accordingly, "[l]esser burdens . . . trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (internal quotation marks omitted) (citing *Burdick,* 504 U.S. at 434, 119 L. Ed. 2d at 254, and *Norman,* 502 U.S. at 288-89, 116 L. Ed. 2d at 723).

For almost two decades, the Supreme Court has applied the analysis used in *Twin Cities* for associational rights cases sounding under the First Amendment, and the Due Process Clause of the Fourteenth Amendment. *Wash. State Grange,* 552 U.S. at 445, 451-52, 170 L. Ed. 2d at 157, 161-62; *Beaver,* 544 U.S. at 585-87, 161 L. Ed. 2d at 929-30; *Cal. Democratic Party,* 530 U.S. at 569, 581-82, 147 L. Ed. 2d at 506, 514; *Twin Cities,* 520 U.S. at 354, 358, 137 L. Ed. 2d at 595, 598; *Norman,* 502 U.S. at 288-89, 116 L. Ed. 2d at 722-23. But there has been some debate about its applicability in equal protection challenges to ballot access provisions. *Rogers v. Corbett,* 468 F.3d 188, 193-94 (3d Cir. 2006), *cert. denied,* 552 U.S. 826, 169 L. Ed. 2d 38 (2007).

We join a growing number of federal courts applying the Supreme Court's associational rights analysis to equal protection challenges in the context of ballot access restrictions on political parties and candidates. *See Barr v. Galvin,* 626 F.3d 99, 109-10 (1st Cir. 2010); *Rogers,* 468 F.3d at 194; *Belitskus v. Pizzingrilli,* 343 F.3d 632, 643 n.8 (3d Cir. 2003); *Fulani v. Krivanek,* 973 F.2d 1539, 1542-44 (11th Cir. 1992). We do so because the interests of equal protection bear a strong relationship to the associational rights protected by our state constitution's free speech and assembly provisions. N.C. Const. art. I, §§ 12, 14; *cf. Anderson v. Celebrezze,* 460 U.S. 780, 793, 75 L. Ed. 2d 547, 561 (1983) ("A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment."); *Rogers,* 468 F.3d at 193-94 (noting a relationship between equal protection claims and associational rights protected by the First Amendment). Indeed, in ballot access cases "equal protection challenges essentially constitute a branch of the associational rights tree." *Republican Party of Ark. v. Faulkner Cnty.,* 49 F.3d 1289, 1293 n.2 (8th Cir. 1995). We are thus persuaded that the analysis used by the Supreme Court in *Twin Cities* is the proper approach for determining whether N.C.G.S. § 163-96(a)(2) violates our state constitution's due process, free speech and assembly, and equal protection provisions.

## II.

The reasoning behind the Supreme Court's severe burdening requirement in *Twin Cities* and preceding cases applies equally in North Carolina. On one hand, "[t]he First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas." *Twin Cities*, 520 U.S. at 357, 137 L. Ed. 2d at 597 (citations omitted). "On the other hand, it is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id.* at 358, 137 L. Ed. 2d at 598 (citations omitted).

In North Carolina, statutes governing ballot access by political parties implicate individual associational rights rooted in the free speech and assembly clauses of the state constitution. N.C. Const. art. I, § 12 ("The people have a right to assemble together to consult for their common good . . . ."); *id.* § 14 ("Freedom of speech . . . shall never be restrained . . . ."). Because citizens form parties to express their political beliefs and to assist others in casting votes in alignment with those beliefs, such statutes inherently affect individual associational rights. *See Anderson*, 460 U.S. at 786-88, 75 L. Ed. 2d at 56-57; *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995) (concluding that restrictions on ballot access for political parties "always implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments."), *cert. denied*, 517 U.S. 1104, 134 L. Ed. 2d 472 (1996). " '[T]he right to form a [recognized] party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes.' " *McLaughlin*, 65 F.3d at 1221 (first alteration in original) (citations omitted). Indeed, ballot access rights, though distinct from voting rights, are central to the administration of our democracy. John V. Orth, *The North Carolina State Constitution* 48 (1995) ("Popular sovereignty means elections, and for elections to express the popular will, the right to assemble and consult for the common good must be guaranteed.").

While these rights are of utmost importance to our democratic system, they are not absolute. *Burdick*, 504 U.S. at 433, 119 L. Ed. 2d at 252-53. In the interest of fairness and honesty, the State "may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Twin Cities*, 520 U.S. at 358, 137 L. Ed. 2d at 598 (citations omitted); *see*

*also Burdick*, 504 U.S. at 433, 119 L. Ed. 2d at 253 ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." (citation and quotation marks omitted)). For these reasons, not all infringements of the right to ballot access warrant strict scrutiny. *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 206, 142 L. Ed. 2d 599, 618 (1999) (Thomas, J., concurring). In fact, requiring "every voting, ballot, and campaign regulation" to meet strict scrutiny " 'would tie the hands of States seeking to assure that elections are operated equitably and efficiently.' " *Id.* (quoting *Burdick*, 504 U.S. at 433, 119 L. Ed. 2d at 253). Hence, strict scrutiny is warranted only when this associational right is severely burdened. *See Twin Cities*, 520 U.S. at 358, 137 L. Ed. 2d at 598.

In the present case, the two percent party recognition requirement of N.C.G.S. § 163-96(a)(2) may burden minor political parties somewhat, but it does not impose a severe burden. First, minority parties seeking recognition pursuant to N.C.G.S. § 163-96(a)(2) have over three and one-half years to acquire the requisite number of signatures.[4] Second, section 163-96(a) places few restrictions on signatories. While these persons must be "registered and qualified voters in this State," they need not register with or promise to vote for candidates of the party seeking recognition. N.C.G.S. § 163-96(a)(2). Signatories are even allowed to vote in a primary of a major party. *See id.* Third, a handful of supporters can acquire the requisite number of signatures. During the 2004-2008 election cycle, for example, over eighty-five thousand signatures were collected for the Libertarian Party by only five people.

Moreover, section 163-96(a)(2) does not impose a severe burden in that the two percent signature requirement is readily achievable. For instance, in 2008 the two percent threshold required signatures from only 69,734 of North Carolina's approximately 5,734,000 registered voters. Further, a minor party has met the two percent recognition requirement eight times in the past five gubernatorial elections.[5] In 2008 the N.C. Libertarian Party's gubernatorial candidate acquired close to three percent of the vote, Elaine F. Marshall, N.C.

4. The relevant period runs from as soon as the previous gubernatorial election is over until the first day of June preceding the next general state election in which the party wants to participate. N.C.G.S. § 163-96(a)(2).

5. 1992—Libertarian; 1996—Libertarian, Natural Law, Reform; 2000—Libertarian, Reform; 2004—Libertarian; 2008—Libertarian.

Dep't of Sec'y of State, *North Carolina Manual* 2007-2008, at 1028 (indicating the Libertarian candidate for governor received 121,584 of 4,268,941 votes), thereby assuring the Party's status as a recognized political party through 2012. N.C.G.S. § 163-96(a)(1). This success indicates the Party may have turned a corner in popular support, effectively graduating it from the recognition requirements of section 163-96(a)(2).

Finally, our state's voter recognition requirements are less burdensome than the Georgia ballot access provisions upheld by the United States Supreme Court in *Jenness v. Fortson*, 403 U.S. 431, 442, 29 L. Ed. 2d 554, 563 (1971). The ballot access statutes at issue in *Jenness* gave a political party only one hundred and eighty days to acquire signatures totaling at least "five per cent. of the total number of electors eligible to vote in the last election." *Id.* at 433, 29 L. Ed. 2d at 557-58 (citations omitted). In contrast, N.C.G.S. § 163-96(a)(2) contains only a two percent requirement and gives parties in North Carolina an additional three years to collect petition signatures.

## III.

When a state ballot access provision does not severely burden associational rights, the interests of the State "need only be sufficiently weighty to justify the limitation imposed on the party's rights." *Twin Cities*, 520 U.S. at 364, 137 L. Ed. 2d at 601 (citations and internal quotation marks omitted). Usually, "a State's important regulatory interests [are] enough to justify reasonable, nondiscriminatory restrictions." *Id.* at 358, 137 S.E.2d at 598 (citations and internal quotation marks omitted); *see also Wash. State Grange*, 552 U.S. at 452, 170 L. Ed. 2d at 162 (observing that the Supreme Court has " 'repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls' " (quoting *Burdick*, 504 U.S. at 438, 119 L. Ed. 2d at 256)); *Beaver*, 544 U.S. at 593-94, 161 L. Ed. 2d at 934-35 (majority) (citations omitted).

Here, the avoidance of "voter confusion, ballot overcrowding," and "frivolous candidacies" is an important regulatory interest. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95, 93 L. Ed. 2d 499, 505 (1986). At the same time, the two percent signature recognition requirement imposes a reasonable hurdle to ballot access. Unlike in some jurisdictions, signatories are not disqualified in North Carolina for having voted in another party's primary or for refusing to register as a member of the party seeking recognition. *Compare, e.g.*, Ohio Rev. Code Ann. § 3513.05 (LexisNexis 2005 & Supp. 2010)

(requiring petition signatures for a candidate to come from members of the same political party as the candidate), *and Storer v. Brown*, 415 U.S. 724, 726-27, 39 L. Ed. 2d 714, 721 (1974) (involving a statute disqualifying voters in the immediately preceding primary election from signing petitions in support of independent candidates), *with* N.C.G.S. § 163-96(a)(2). The North Carolina recognition requirements at issue are also more permissive than the Georgia ballot access requirements that were upheld by the Supreme Court and which required a new party to reach a five percent signature threshold within one hundred and eighty days. *Jenness*, 403 U.S. at 433, 29 L. Ed. 2d at 558. Further, we see no indication that the recognition requirements here discriminate against minor parties or "operate to freeze the political status quo" of a two-party system. *Id.* at 438, 29 L. Ed. 2d at 560. As a result, we conclude that the State's important regulatory interests are "sufficiently weighty" to justify the reasonable burden placed by N.C.G.S. § 163-96(a)(2) on appellants' associational rights.

## CONCLUSION

In sum, we hold that the Court of Appeals erred in applying strict scrutiny but correctly concluded that N.C.G.S. § 163-96(a)(2) does not violate Article I, Section 12, 14, or 19 of the Constitution of North. Carolina. Accordingly, we modify and affirm the decision of the Court of Appeals upholding the trial court's judgment in favor of the State.

MODIFIED AND AFFIRMED.

Justice JACKSON did not participate in the consideration or decision of this case.

Justice NEWBY dissenting.

"A frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." N.C. Const. art. 1, § 35. This case invites us to return to these fundamental democratic principles, specifically, the right of open access to the election ballot. Ballot access implicates our citizenry's freedom of association, freedom of speech, and freedom to vote. While the State has an interest in the orderly administration of elections, my fear is that North Carolina's signature requirement, N.C.G.S. § 163-96(a)(2) (2007), may unduly limit election ballot access. The majority finds the signature requirement statute to be a non-"severe" infringement of this fundamental right and deferentially reviews the statute. Because I believe

an encroachment of this fundamental right deserves strict scrutiny, I respectfully dissent. I would remand this case to allow the trial court to conduct a thorough strict scrutiny review of § 163-96(a)(2).

While I agree with the majority that ballot access is a fundamental right, I disagree with the treatment of the right. Traditionally, the infringement of a fundamental right demands that a court apply strict scrutiny. The majority, however, now says that a statute limiting the fundamental right of ballot access is an exception to this rule: rather than apply strict scrutiny, a court will first evaluate the extent of the infringement, and if the infringement is not "severe," then the court will apply a deferential review. I believe this to be an unwarranted and imprudent departure from North Carolina's constitutional jurisprudence.

I agree that fundamental rights are not absolute and a burden on a fundamental right may be permissible. However, under our existing jurisprudence, once we determine that a fundamental right is burdened, the strict scrutiny standard is the sole inquiry used to determine whether that burden is permissible—there is no initial threshold inquiry. *See, e.g., Rhyne v. K-Mart Corp.*, 358 N.C. 160, 180, 594 S.E.2d 1, 15 (2004) ("If the statute at issue affects the exercise of a fundamental right . . . *we apply strict scrutiny.*" (emphasis added)). A burden on a fundamental right is permissible only when the State succeeds in demonstrating that the burden is narrowly tailored to further a compelling interest. *See, e.g., State v. Petersilie*, 334 N.C. 169, 186-87, 432 S.E.2d 832, 842-43 (1993) (permitting a restraint on speech because it survived strict scrutiny); *cf. Blankenship v. Bartlett*, 363 N.C. 518, 524-27, 681 S.E.2d 759, 764-66 (2009) (applying intermediate scrutiny to "quasi-fundamental" right).

In place of traditional strict scrutiny, the majority introduces the "severe burden" inquiry of *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358-59, 117 S. Ct. 1364, 1369-70, 137 L. Ed. 2d 589, 597-98 (1996). *Twin Cities* is not persuasive authority for the majority's abandonment of the strict scrutiny test for a direct burden on ballot access rights. In *Twin Cities*, "[t]he laws [did] not directly limit the party's access to the ballot" but concerned whether a candidate's name could appear multiple times on a ballot. *Id.* at 363, 117 S. Ct. at 1372, 137 L. Ed. 2d at 601.

Moreover, *Twin Cities* highlights a critical flaw in the "severe burden" inquiry: the inquiry is entirely too subjective. In *Twin Cities*, the trial judge and six Justices of the Supreme Court of the United

States found the burdens to be minor, *id.* at 355, 359, 117 S. Ct. at 1368, 1370, 137 L. Ed. 2d at 596, 598-99; but three appellate judges determined that the laws in *Twin Cities* were actually "severe" burdens, *id.* at 363-64, 117 S. Ct. at 1372, 137 L. Ed. 2d at 601, as did three dissenting Justices, *see id.* at 370-71, 117 S. Ct. at 1376, 137 L. Ed. 2d at 606 (Stevens, Ginsburg & Souter, JJ., dissenting) (disputing the majority's conclusion that the laws were "minor burdens" and calling the burdens "significant"). The federal judiciary was divided 7-to-6 regarding the severity of the burden. The majority's approach allows a trial court to subjectively assess the degree of burden, rather than relying upon the nature of the protected right, to determine the standard of review. Thus, a citizen, after having already established that a statute burdens a fundamental right, must now convince a court that the burden is "severe" enough, or else the court will defer to the legislature. For instance, here, the majority decided that the signature requirement statute did not impose a sufficiently "severe" burden on a fundamental right, despite the statute's impact of excluding the Green Party from the ballot and forcing the Libertarian Party to spend almost $130,000 to access the ballot.

In contrast to the majority, I believe strict scrutiny is the appropriate test for a burden on the fundamental right of access to the ballot. Any review that is less demanding than strict scrutiny will be an inadequate safeguard of this foundational democratic principle.

Access to the ballot is an extension of the freedom of association. The freedom to associate with others to advocate for personal beliefs is a cornerstone of our democratic society, but "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes." *Williams v. Rhodes*, 393 U.S. 23, 31, 89 S. Ct. 5, 10-11, 21 L. Ed. 2d 24, 31 (1968); *see also* Alexis de Tocqueville, *Democracy in America* 71-72 (Andrew Hacker ed., Henry Reeve trans., Washington Square Press 1972) (1863) (observing that the freedom of political associations permits "the partisans of an opinion [to] unite in electoral bodies, and choose delegates to represent them in a central assembly. This is, properly speaking, the application of the representative system to a party.").

Access to the ballot is also an extension of the freedom of speech. "In our political life, third parties are often important channels through which political dissent is aired." *Williams*, 393 U.S. at 39, 89 S. Ct. at 14, 21 L. Ed. 2d at 36 (Douglas, J., concurring); *Munro*

*v. Socialist Workers Party*, 479 U.S. 189, 200, 107 S. Ct. 533, 540, 93 L. Ed. 2d 499, 509 (1986) (Marshall & Brennan, JJ., dissenting) ("[A minor party's] very existence provides an outlet for voters to express dissatisfaction with the candidates or platforms of the major parties."). "The minor party's often unconventional positions broaden political debate, expand the range of issues with which the electorate is concerned, and influence the positions of the majority, in some instances ultimately becoming majority positions." *Munro*, 479 U.S. at 200, 107 S. Ct. at 540, 93 L. Ed. 2d at 509.

Further, ballot access implicates the right to vote. The inclusion of additional political parties facilitates voting by increasing the options on the ballot, *Williams*, 393 U.S. at 31, 89 S. Ct. at 11, 21 L. Ed. 2d at 31 ("[T]he right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot."), while simultaneously increasing the information conveyed to voters, *see Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 220, 107 S. Ct. 544, 552, 93 L. Ed. 2d 514, 527 (1986) ("To the extent that party labels provide a shorthand designation of the views of party candidates on matters of public concern, the identification of candidates with particular parties plays a role in the process by which voters inform themselves for the exercise of the franchise." (citation omitted)). At our nation's inception, the founders warned that unduly restricting ballot access could make illusory the right to vote: "It is *essential* to such a government that it be derived from the great body of the society, not from an inconsiderable proportion or a favored class of it; otherwise a handful of tyrannical nobles, exercising their oppressions by a delegation of their powers, might aspire to the rank of republicans and claim for their government the honorable title of republic." *The Federalist* No. 39, at 233 (James Madison) (Henry Cabot Lodge ed., 1888).

This Court has consistently interpreted the North Carolina Constitution to provide the utmost protection for the foundational democratic freedoms of association, speech, and voting. *See, e.g., State v. Frinks*, 284 N.C. 472, 477-83, 201 S.E.2d 858, 862-65 (1974) (upholding restriction on right to assemble because necessary to assure safety and convenience); *State v. Petersilie*, 334 N.C. 169, 182-84, 432 S.E.2d 832, 839-41 (1993) (infringement of political speech receives strict scrutiny); *Northampton Cnty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 745-47, 392 S.E.2d 352, 355-56 (1990) (infringement of right to equal vote receives strict scrutiny). It is

inconsistent for the majority to now afford the fundamental right of ballot access, which is clothed in this triumvirate of fundamental rights, less protection than one of these rights receives individually.

Because I believe strict scrutiny is appropriate, I also question whether the trial court properly applied the standard to § 163-96(a)(2). The trial court ruled that the statute survived strict scrutiny, and the Court of Appeals affirmed its decision. *Libertarian Party of N.C. v. State*, —— N.C. App. ——, ——, 688 S.E.2d 700, 707-09 (2009). Based on the trial court's findings, however, it appears the trial court improperly maintained a presumption of constitutionality during its strict scrutiny analysis.

In my view, the presumption of constitutionality places an initial burden on the challenger of a statute, who must clearly demonstrate a conflict with a constitutional right before we proceed any further in our review. *See State ex rel. Att'y-Gen. v. Knight*, 169 N.C. 333, 352, 85 S.E. 418, 427 (1915) ("When the constitutionality of an act of the General Assembly is questioned, the courts place the act by the side of the Constitution, with the purpose and the desire to uphold it if it can be reasonably done, but under the obligation, if there is an irreconcilable conflict, to sustain the will of the people as expressed in the Constitution, and not the will of the legislators, who are but agents of the people.").

If a challenger clearly shows that a statute infringes on a fundamental right—as happened in the case at hand—strict scrutiny is applied, meaning the State bears the burden of demonstrating that the statute is narrowly tailored to further a compelling interest. *Stephenson v. Bartlett*, 355 N.C. 354, 377, 562 S.E.2d 377, 393 (2002). If the challenger succeeds in demonstrating that the statute is in conflict with only a quasi-fundamental right, the State then bears the burden of showing the statute is substantially related to an important government interest. *See Dep't of Transp. v. Rowe*, 353 N.C. 671, 675, 549 S.E.2d 203, 207 (2001). However, if the challenger shows a conflict with a non-fundamental right, then the challenger bears the burden of demonstrating that the statute is not rationally related to a legitimate State interest. *See id.* Thus, the presumption of constitutionality is a precursor—rather than an alternative—to constitutional review.

In this case, if the trial court assumed the plaintiffs and intervenors had demonstrated a conflict with a fundamental right, then the initial presumption of constitutionality was defeated and the

State had the burden of demonstrating that the statute is narrowly tailored to further a compelling interest. The trial court, however, retained the presumption of constitutionality during its strict scrutiny analysis and failed to shift the burden to the State. For example, it seems the State never demonstrated that the 2% requirement in § 163-96(a)(2) was narrowly tailored to accomplish a compelling interest: the State's witness, Gary Bartlett, could not recall any legislative studies or debates regarding the 2% requirement, and he disclosed that any discussion about the requirement "was basically, 'Okay, this looks good; let's try it,' that sort of conversation." In fact, Mr. Bartlett admitted that he believed 1% would accomplish the State's objective. Because the strict scrutiny standard was not properly applied to this fundamental right, I would remand the case to allow the trial court to conduct a thorough strict scrutiny review of § 163-96(a)(2).

Today's decision jeopardizes a quintessential component of our democracy by examining this statute under a deferential standard of review, rather than a strict scrutiny analysis. Given the vital role ballot access plays in our democratic society, we should only condone an infringement of this right when absolutely necessary. I do recognize the State's interest in the orderly administration of elections, and I do believe it is within the province of the General Assembly to place necessary restrictions on ballot access. However, such restrictions burden a fundamental right, and I believe the judicial branch must strictly scrutinize them to ensure that the General Assembly imposes only narrowly tailored, necessary burdens. After reviewing the trial court's findings, it appears a misunderstanding of our constitutional presumptions infected the trial court's application of the strict scrutiny standard. Having clarified our precedent, I would remand this case to the trial court to strictly scrutinize North Carolina's signature requirement statute. Accordingly, I respectfully dissent.